IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

MARCH 1999 SESSION

FILED

October 19, 1999

Cecil Crowson, Jr.

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. # 03C01-9808-CR-00275 |
| Appellee, | * | HAMILTON COUNTY |
| VS. | * | Hon. Douglas A. Meyer, Judge |
| CHARLES ERIC GOODWIN, | * | (Attempted Second Degree Murder and Second Degree Murder) |
| Appellant. | * | |

For Appellant:

Allen R. Beard, Attorney
615 Lindsay Street, Suite 110
Chattanooga, TN  37403-0110

For Appellee:

Paul G. Summers
Attorney General and Reporter

R. Stephen Jobe
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
Second Floor, Cordell Hull Building
Nashville, TN  37243-0493

C. Leland Davis
and
Caldwell Huckabay
Assistant District Attorneys General
City and County Courts Building
Chattanooga, TN  37402

OPINION FILED:_____

AFFIRMED

GARY R. WADE, PRESIDING JUDGE

OPINION

The defendant, Charles Eric Goodwin, was convicted in a bench trial of the second degree murder of Gregory Billups, Jr., and the attempted second degree murder of Eddie Birdsong. The trial court imposed concurrent, Range I sentences of twenty-five years and twelve years, respectively. In this appeal of right, the defendant challenges the sufficiency of the evidence as to each conviction and contends that certain of the testimony should not have been excluded from consideration.

We affirm the judgment of the trial court.

During the early morning hours of June 8, 1995, William Anthony Taylor drove the defendant to the Chattanooga residence of Betty Calloway, the defendant's girlfriend. Ms. Calloway lived in a two-story house on Duncan Avenue that had been converted into apartments. After leaving the car and as he approached the residence, the defendant saw the victim, Gregory Billups, Jr., and Ostonia Woodall talking outside the apartments. The defendant made a remark to Ms. Woodall which resulted in an altercation between the defendant and Billups. After initially attempting to stop the fight, Eddie Birdsong, who was a brother to Billups, joined the fray. According to witnesses, the altercation among the men lasted between ten and fifteen minutes and ended when the defendant, who had been beaten and had lost a shoe, ran to an automobile owned by Rodney Gordon. Taylor, who was a codefendant in the bench trial, had little involvement in the fight, according to at least one of the state's witnesses, except to try to stop it.

Later, the defendant, driving his own automobile, returned to the residence with Taylor, Gordon, James Duke, James Davenport, and perhaps others. He was present when the victim Birdsong was assaulted and when the victim Billups

was murdered.

The evidence was disputed at trial. Stephanie Feaster, a sister to Billups, testified that she was at her second story apartment with her one-year-old son. Billups, Birdsong, and Ms. Woodall, who had a newborn daughter, were also present. Ms. Feaster recalled hearing a loud crashing sound and, after walking downstairs to investigate, observed Billups choking the defendant. She stated that Taylor was attempting to break up the fight and that Birdsong was able to separate the combatants. A fight then erupted between Birdsong and the defendant after which Ms. Feaster returned to her apartment. Later, Ms. Feaster overheard Billups and Birdsong, neither of whom were armed, laughing about how badly the defendant had been beaten. After an interval of time, Billups and Birdsong decided to go to a grocery store for beer. Ms. Feaster recalled that Billups armed himself with an ice pick as Birdsong walked ahead down the stairway. Ms. Feaster then heard two gunshots and Billups, who went downstairs to investigate, directed her to return to the apartment, lock the doors, and call the police. Ms. Feaster stated that she hid behind a door when she heard a voice outside calling out, "It's another m----- f---- upstairs, let's get him." Ms. Feaster testified that she then heard a crash at her door, saw the defendant and Taylor standing next to Billups, and observed Taylor shoot Billups once from relatively close range. Ms. Feaster recalled that immediately after the shooting, Taylor and the defendant fled down the stairway.

Ostonia Woodall, Billups' girlfriend, also testified for the state. She stated that the initial fight erupted due to a remark the defendant had made to her. She stated that Billups took exception, a fight ensued, and that Taylor and Birdsong attempted to intervene. She stated that Birdsong then fought with the defendant and ultimately chased him away through an alleyway. Ms. Woodall testified that sometime later she heard gunshots and then someone say, "There is one more in

3

the house, there is another one in the house." Ms. Woodall called the police and, as she was speaking with a 911 dispatcher, heard a gunshot inside the apartment.

Eddie Birdsong testified that he had intervened in the initial fight because he had discovered his brother, Billups, choking the defendant while Taylor was on Billups' back. Birdsong recalled pushing Taylor off his brother and then separating Billups and the defendant. He stated that when he was struck by the defendant, who continued to try to fight with Billups, he "then ... whooped him." Birdsong described the demeanor of the defendant as "on something." Birdsong testified that sometime later he went downstairs and again saw the defendant who said, "It's over with me." Birdsong stated that he then overheard the defendant talking to someone else, who he could not see in the dark. Birdsong related that the defendant then produced a gun and fired in his direction. Birdsong was able to flee from the scene without being hurt.

Detective Dan Moody of the Chattanooga Police Department led the investigation. He learned that the defendant had been hospitalized with a stab wound and arranged a gunshot residue analysis at approximately 9:00 A.M., only a few hours after the shooting. The test was inconclusive. Detective Moody testified that Taylor claimed that he had broken up a fight in which the defendant was involved and, after returning to the defendant's residence, discovered that the defendant had been stabbed in the initial fray. Taylor made no mention of returning to the Duncan Avenue residence in his first statement to the detective but admitted in his second statement that he and the defendant had returned there, saw other individuals chasing someone, and then heard a gunshot.

Detective Moody also questioned the defendant, who claimed that he was stabbed when he bent over to pick up a necklace after the initial altercation with

4

Billups. The defendant told the detective that during the second confrontation someone reached over him and fired a pistol at Billups. In his initial statement, the defendant made no mention of Frederick Rollins. Several months later, the defendant sent Detective Steve Angel a letter claiming that Rollins had shot Billups and that he and James Duke had witnessed the shooting. The defendant claimed that Rollins later killed Duke, who had suggested to Rollins that he should confess to the killing of Billups.

Frank King, M.D., the county medical examiner, testified that Billups died from a single gunshot wound that entered his left lateral back and traveled in an upward direction into his right chest cavity. Dr. King estimated that the gun was fired from about two feet.

Detective Tim Carroll, who investigated the murder of Duke, testified that Rollins had been charged and convicted of that crime. Detective Carroll also testified that he had investigated the defendant's claim that Rollins had also shot Billups. After comparing the bullets in each murder, Detective Carroll determined that there was no match. Other witnesses established that there was no relationship between the Billups and Duke murders.

The defendant claimed that he was attacked by Birdsong and Billups for no reason and that Taylor's only involvement was to try to break up the fight. The defendant contended that he was aware that his mother, when she learned of his beating, intended to travel to the Duncan Avenue home to confront his assailants, and testified that he returned there to find her. He claimed that the other men, who had heard about the altercation, just happened to arrive at about the same time. The defendant claimed that when he saw Birdsong, he signaled that there was no further argument between them and that Birdsong did likewise. The

5

defendant claimed that Birdsong nevertheless followed him in a threatening manner as he walked into a dark area. He recalled that one or two shots were then fired.

The defendant explained that, after the initial fight, he asked Rodney Gordon for a ride to his car because he did not want to leave it overnight in the projects. He stated that when he retrieved his car, his friends in the neighborhood asked what had happened and learned that he had been beaten by Birdsong and Billups at the Duncan Avenue residence. The defendant claimed that when he returned to the scene, he first saw Birdsong, who said, "What's up, nigger? What's up? You want some more?" He testified that he responded, "It's over with, man," and that Birdsong commented, "Well, you shouldn't have come around here with that anyway." The defendant denied that he had a weapon in his possession. He contended that Birdsong followed him all the way to the front of the house where it was particularly dark. The defendant testified that he heard a shot at that point and fell to the ground to avoid being struck. The defendant stated that he went around to the front door and into the hallway of the apartment, "staying out of sight." The defendant stated that "there was some more guys following ... behind me ... in the hallway," who he identified as "240, J.D., [and] Tony Richardson." The defendant testified that he then saw Billups coming down the steps:

> And next thing I know, there was a push or something ....
> I don't know. It was words being exchanged or whatever,
> somebody pushing me out of the way. I fell holding my
> side, and next thing you know, I heard people kind of like
> stampede past me. I heard shooting. Once I heard the
> shooting, people started running back ... past me ...
> pushing me out of ..., and somebody helped me up ... off
> the ground.... I don't know whether I was stabbed or
> shot.

The defendant testified that he was taken to his mother's residence where his brother called for an ambulance to take him to the hospital. The defendant recalled that when he woke up from surgery, he was handcuffed. He

6

stated that the police performed a test on his hands in an effort to determine the presence of gunpowder. At trial, the defendant, who had a prior felony record, claimed that Frederick Rollins had shot Billups.

Joyce Duke, the mother of James Duke, testified for the defense. She recalled that before his death, her son had informed her that Rollins had killed Billups. The state objected to the testimony as hearsay and the trial court ruled it inadmissible. Ms. Duke admitted that the codefendant Taylor was the father of her daughter's child. She confirmed that Rollins had killed her son.

James Davenport, who admitted that he had been drinking on the night of the shooting and had an unclear memory of the events, testified that he was told by the defendant and Taylor of the altercation with Billups and Birdsong. Davenport claimed that he saw Rollins rush past the defendant and shoot Billups. Davenport also claimed that Rollins bragged afterwards about having shot Billups.

Jamie Jackson, a former correctional officer in the Hamilton County Jail, also testified for the defense. He recalled that the defendant and Rollins, who were both incarcerated at the time, engaged in an argument wherein the defendant accused Rollins of having killed a man. Jackson stated that he overheard the defendant shout, "You know you killed him," after which Rollins retorted, "Yeah, I know that, but nobody else does."

The defendant's mother, Joyce Goodwin, also testified on behalf of the defense. She claimed that when the defendant returned from the Duncan Avenue residence, his nose was bloody and he had no shoes. She stated that when she learned that he had been beaten by two individuals, Ms. Goodwin picked up a friend, Darlene Jones, and drove to Duncan Avenue. She testified that when she

arrived, however, the area was full of police officers. She stated that she had been delayed to the Duncan Avenue residence when she stopped for gas. Upon returning home, she discovered that the defendant and the police were at her residence.

Ms. Darlene Jones testified to substantially the same series of events as Ms. Goodwin. She did differ in one regard, however, in that she remembered driving straight to the Duncan Avenue residence and then stopping for gas afterward.

I

Initially, the defendant complains that the evidence was insufficient to support either of his convictions. Because the defendant Taylor was acquitted in the bench trial, the defendant argues that the trial judge's "decision was based on pure surmise," supportive of neither the state's theory nor that offered by the defense. The defendant bases his argument on the fact that Ms. Feaster, the only eyewitness to the shooting, testified that Taylor had fired the weapon. He asserts that the trial judge, who determined that Ms. Feaster was "simply ... wrong about what she says she saw," had no basis to reject that portion of her testimony while accrediting the balance of her assertions: "[t]he trial court based its decision entirely on its own tortured interpretation of the evidence."

The state's theory was that the defendant, motivated by revenge after he had been beaten, gathered some of his friends from the projects and returned to Duncan Avenue to confront Birdsong and Billups. The state sought to prove that the defendant, who had been drinking, shot at Birdsong and then chased after Billups on the stairway where either the defendant or Taylor shot Billups. The theory of the state was that the defendant was either the perpetrator or was criminally responsible

8

for the conduct of Taylor. It contended that the defendant told his friends that he "got ganged" and that the police came in response to Ms. Woodall's call, where the shot was recorded, and not that of the defendant; that the defendant shot at Birdsong because he was embarrassed by getting whipped by the younger men; and that Billups "stuck the defendant with an ice pick" and started to run before being shot by either the defendant or Taylor. The state's theory was that Ms. Feaster, a seventeen year old with her own child, was so frightened by the course of events that she could have been mistaken about which of the two defendants fired the fatal shot.

The defense theory was that the defendant returned to the Duncan Avenue residence only because he thought his mother was there; that he was not armed and that the outside area was so dark the state could not prove who fired shots at Birdsong. The defense theory was that the defendant fell to the ground after being stabbed by Billups inside the apartments and that Rollins chased Billups up the stairway and shot him.

At the conclusion of the proof, the trial judge found that Taylor had been a peacemaker when a fight broke out between Billups and the defendant and that Birdsong had intervened and then beaten the defendant. He determined that the defendant returned to his residence, gathered some friends, and returned to challenge Billups and Birdsong. The trial judge concluded that Birdsong, upon leaving the apartment, observed the defendant and followed him around the corner of the residence in order to determine why he had returned when the defendant "fired twice at him." The trial judge also found that Billups, who had heard the gunshots and had armed himself with an ice pick, directed Ms. Woodall and Ms. Feaster upstairs and stuck the defendant with an ice pick when the latter entered the stairway. He determined that Ms. Feaster was "honestly mistaken" and that in

9

reality the defendant had fired the fatal shot into the back of Billups as he ran up the stairway. The trial judge placed emphasis upon the upward angle of the shot as determined by Dr. King and also concluded that the defendant "was not in a state of passion" at the time of the shootings, a state of mind which might have reduced the offense to voluntary manslaughter. Taylor was acquitted because, in the words of the trial judge, he did not share in the criminal intent to commit murder and did not, according to his interpretation of the proof offered, fire any of the shots at Birdsong or Billups.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e).

Although this case was a bench trial, the findings of the trial judge who conducted the proceedings carry the same weight as a jury verdict. State v. Tate, 615 S.W.2d 161, 162 (Tenn. Crim. App. 1981). Questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and all factual issues raised by the proof are matters entrusted to the trier of fact. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). This court may neither reweigh nor reevaluate the evidence. State v. Cabbage, 571 S.W.2d at 835.

10

Second degree murder is defined as the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). Criminal attempt is defined in pertinent part as follows:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>     (3) acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

The trial judge made reference to criminal responsibility for conduct of another:

> A person is criminally responsible for an offense committed by the conduct of another if (2) acting with the intent to promote or assist the commission of the offense or to benefit in the proceeds or result of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense.

The evidence offered at trial was contested. Some of the proof offered may have been untruthful. Other testimony, while not untruthful, may have been mistaken due to the variety of emotions produced in the witnesses in consequence of the course of events. There was, however, testimony of each and every element of the offense of the second degree murder of Phillips and the attempted second degree murder of Birdsong. There was proof that the defendant, after being beaten and possibly embarrassed by the initial altercation on Duncan Avenue, summoned the assistance of his friends and returned to the residence to confront Birdsong and Billups. A gun was obviously present and there was testimony that neither Billups nor Birdsong had a gun. There was proof that the defendant or his friends were armed and that two shots were fired at Birdsong before Billups, who, in anticipation of trouble sought to protect himself by the use of an ice pick, was shot in the back either by the defendant or with the assistance and participation of the defendant.

11

The gunshot, which apparently resulted in the death of Billups, can be heard on the 911 call made by Ms. Woodall.

As pointed out by the state, there was proof the defendant had a motive and the opportunity to commit the offenses. There was direct testimony as well as circumstantial evidence which contradicted his claim that he was merely present at the time the shots were fired at Birdsong and Billups. Furthermore, the trial court had a factual basis upon which to reject any claim by the defendant that the crimes against Billups and Birdsong should have been voluntary manslaughter or attempted voluntary manslaughter. It was the prerogative of the fact finder to determine whether there was adequate provocation "sufficient to lead [the defendant] to act in an irrational manner." There were circumstances in this instance which indicate that the passion or anger, which might have naturally been present in the defendant, had subsided from the time of the first altercation until the second confrontation. For example, the defendant claimed that when he saw Birdsong, he indicated that there was no longer any quarrel between them and he walked away just before the first shots were fired. The defendant testified that he had gone home to forget about the incident and only returned to check on his mother, who had stated that she intended to investigate the incident. The trial judge, as was his prerogative as the trier of the facts, chose to reject the defendant's claim that the stab wound from the ice pick had provoked the defendant to kill Billups. There was a basis for that finding. Witnesses overheard a comment, "there's another one upstairs" in reference to Billups and "let's get him."

In our view, the evidence was sufficient. So long as there was a factual basis in the record for his conclusions, the trial judge was entitled to assess the credibility of each witness and make an interpretation of the proof at trial without accepting either the state's theory or that of the defense.

12

II

The defense theory was that Frederick Rollins killed the victim. While the trial court initially allowed hearsay evidence which indicated Rollins was the assailant, it ultimately determined that the evidence was inadmissible. James Duke, who was with the defendant on the night Billups was killed, was later murdered by Rollins. Joyce Duke, the mother of James Duke, testified that she had overheard her son, two days before his own death, claim that Rollins had killed Billups. James Davenport, who was transported to prison with Rollins, testified that Rollins had admitted to the killing several times. Jamie Jackson, a jail employee, testified that he had overheard Rollins admit to participating in one or more killings.

The defendant claims that the trial judge excluded the evidence on grounds of irrelevancy or hearsay. The defendant insists that the testimony offered by the three witnesses should have been admitted:

> (1) as to Ms. Duke's testimony, the defendant contends that the evidence was admissible under Rule 804(a)(4) of the Tennessee Rules of Evidence;

> (2) as to the testimony of James Davenport, the defendant claims that the evidence was not offered to prove the truth of the matter asserted; and

> (3) as to Jamie Jackson's testimony, the defendant argues that the evidence was not offered to prove the matter asserted but to show that Rollins had admitted killing someone in an argument with the defendant.

Initially, we reject the notion that the proof was not offered to prove that someone other than the defendant killed Billups or fired the shots at Birdsong. The defendant makes no real argument in support of that claim. Thus, the hearsay rules would apply. Rule 804(b)(3) of the Tennessee Rules of Evidence, the statement against interest exception to the rule against hearsay, provides as follows:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or propriety interest,

13

> or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

The statement against interest is admissible only if the declarant is unavailable. James Duke's statement to his mother that he had witnessed Rollins shoot the victim Billups does not, in our view, qualify as a statement against interest. The declarant, James Duke, even though unavailable due to his death, did not subject himself to criminal liability by making the statement. The offered evidence was, therefore, properly excluded.

James Davenport, who testified without objection that he had observed Rollins shoot Billups, also stated that Rollins had bragged about his involvement afterward and had acknowledged having fired the fatal shot. When Davenport testified that Rollins admitted that he "bust[ed] the mf," there was no objection by the state. When he discussed the conversation that he had with Rollins on their way to prison, wherein Rollins acknowledged having "shot two or three people," there was no objection. After hearing this and all of the other testimony at issue, the trial court, when rendering the verdict, made the following ruling:

> [T]he one thing that I did not deal with, and that is the testimony we heard about an alleged alternative perpetrator, which would be the testimony that was heard about Freddy Rollins, and the court finds the testimony about the alleged perpetrator is not admissible, that none of the testimony was admissible.

The ruling, which was made as an aside while the trial court was rendering the verdict, cannot be interpreted as broadly as it might appear. Those objections that were made by the state were based upon the rule against hearsay. The trial court reserved judgment, heard the evidence, and expressed his intent to

14

render a ruling at a later time. It is our view that the trial judge's ruling at the end of the proof only pertained to testimony which was at issue and not that introduced without objection. In fact, the ruling appears to be limited to the testimony of Joyce Duke which the trial court characterized as follows:

> It is hearsay.... I will allow you to present it for the record.... Well, it would be coming in just for the record then I can decide later whether to consider it or not.

Nevertheless, even if the trial judge was making reference to the hearsay testimony offered by Davenport of his conversations with Rollins after the night of the shooting, an exclusion would not have been erroneous. While Rollins' statements were certainly against his own interests, the defense did not establish that Rollins was unavailable, as required by the rule. Tenn. R. Evid. 804(b). The proponent of the evidence, the defendant in this case, has the responsibility of issuing a subpoena. Here, the defendant did so. During the course of the trial, however, after it became clear that Rollins would be available to testify, the defendant chose not to call him as a witness:

> THE COURT: At this point, Mr. Beard, there was a question about whether or not you wish to have the testimony of Freddy Rollins, and we have located him. He is ... in Bledsoe County at Pikeville, and they are scheduled to ... send him over here at 6:00 o'clock in the morning, which would be 7:00 our time, but you have decided that you do not wish to call him?
>
> MR. BEARD: That is correct, your honor.
>
> THE COURT: And Mr. Sloan and Mr. Poole (counsel for the defendant Taylor) you both have decided that you do not wish to have Rollins' testimony?
>
> MR. POOLE: That's correct, your honor.
>
> THE COURT: And the state does not wish to call him either?
>
> MR. DAVIS (assistant district attorney general): No.

15

The defendant also argues as an excuse that "had [Rollins] been in court, it is highly unlikely that he would have admitted to the killing and would have certainly invoked the privilege against self-incrimination...." Rule 804(a)(1) of the Tennessee Rules of Evidence includes in its definition of "unavailability," "situations in which the declarant ... is exempted by ruling of the court on grounds of privilege from testifying concerning the subject matter of the declarant's statement...." In order to be deemed unavailable, however, the witness must actually "assert a privilege and the court should rule that the privilege is properly invoked." Neil P. Cohen, et al., Tennessee Law of Evidence, § 804(a)(2), at 590 (3d Ed. 1995). That was not done in this case. For these reasons, an exclusion of the hearsay evidence offered by Davenport would have been entirely appropriate.

Jamie Jackson testified that he overheard Rollins in an argument with the defendant admit having killed someone. The defendant's brother, Tracy Goodwin, who was also incarcerated, was involved in the quarrel. Jackson recalled that the defendant said, "You need to tell these people that you killed that boy." Jackson remembered that Rollins initially denied that he had done so but after a continuation of similar dialogue, the exchange ended as follows:

> THE DEFENDANT: You know you killed him. You know that we didn't have nothing to do with that.
>
> ROLLINS: Yeah, I know that, but nobody else does.
>
> THE DEFENDANT: Well, then, you need to tell those people you killed that boy.
>
> ROLLINS: No, I'm not telling them nothing.

Jackson described the argument as having lasted for as long as an hour. When questioned by the trial judge, Jackson admitted that the name of the victim was "never mentioned."

Again, Rollins was not unavailable as is required before a statement

16

against interest can be properly introduced.  In consequence, the evidence was properly excluded.  There was no error.

Accordingly, the judgment is affirmed.

_____
Gary R. Wade, Presiding Judge

CONCUR:


_____
Norma McGee Ogle, Judge


_____
Cornelia A. Clark, Special Judge

17