IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 26, 2005

## STATE OF TENNESSEE v. GREGORY MULLINS

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S48,296-297    Jon K. Blackwood, Judge**

_____

**No. E2004-02314-CCA-R3-CD - Filed August 25, 2005**

_____

The defendant, Gregory Mullins, was convicted of two counts of violating the vehicle registration law, two counts of driving on a suspended license, two counts of criminal impersonation, one count of speeding, one count of misdemeanor evading arrest, and one count of felony evading arrest. The trial court imposed a Range III, career offender sentence of six years for the felony evading arrest offense; concurrent terms of forty-five days for each of the driving on a suspended license offenses; eleven months, twenty-nine days for the misdemeanor evading arrest offense; and forty-five days for each of the criminal impersonation offenses. In addition, the defendant was fined $50 for each of the vehicle registration offenses; $50 for the speeding offense; $500 for each of the driving on a suspended license offenses; $3,000 for the felony evading arrest offense; $2,500 for the misdemeanor evading arrest offense; $500 for one of the impersonation offenses; and $250 for the remaining impersonation offense. In this appeal, the defendant asserts that the evidence is not sufficient to support several of his convictions and that the dual convictions for misdemeanor evading arrest and felony evading arrest violate principles of double jeopardy. Because the convictions for felony and misdemeanor evading arrest violate the principles of double jeopardy, the conviction for misdemeanor evading arrest must be merged into the conviction for felony evading arrest. Otherwise, the judgment of the trial court is affirmed.

### Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed as Modified

GARY R. WADE, P.J., delivered the opinion of the court, in which J.C. MCLIN, J., joined. DAVID H. WELLES, J., filed a concurring and dissenting opinion.

Joseph F. Harrison, Assistant Public Defender, Blountville, Tennessee, for the appellant, Gregory Mullins.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Greeley Wells, District Attorney General; and Joseph E. Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

During the early morning hours of September 28, 2003, Officer Kevin Hyatt of the Kingsport Police Department was on patrol in his marked police cruiser when he saw a brown Nissan pickup truck with an expired license tag drive by. He pulled the truck over and, before he could leave his vehicle, the driver of the pickup approached the cruiser. Officer Hyatt met the driver and saw the passenger of the pickup walk away. Officer Hyatt described the passenger as being about five feet, eight or nine inches tall, and weighing at least three hundred pounds. According to Officer Hyatt, the passenger was considerably larger than the defendant.

Officer Hyatt asked the driver of the pickup his name and the driver responded, "Brandon Lee Wood." The driver also gave Officer Hyatt a birth date, but could not produce any identification. The driver stated that he did not know his social security number. The driver claimed that he had a driver's license from the State of Virginia. He was also unable to produce any registration for the pickup, explaining that it belonged to a friend.

Officer Hyatt issued a citation to Brandon Lee Wood and the driver signed it, "Brandon Wood." When the passenger returned, Officer Hyatt asked him if he possessed a driver's licence. The passenger told Officer Hyatt that his license had been suspended. Officer Hyatt then warned both men not to drive the truck again and directed them to find a licensed driver to remove the truck or have it towed. Officer Hyatt also warned the men that they would be arrested if he saw either one of them driving the truck again.

Officer Hyatt left the scene and drove a short distance to a lighted parking lot to do the paperwork incident to the citation. A few minutes later, he saw the brown pickup being driven by the defendant. Officer Hyatt pulled behind the truck and turned on his blue lights. When the truck accelerated, Officer Hyatt turned on his siren. The truck sped up to sixty-miles-per-hour with Officer Hyatt in pursuit. The street on which the truck was being driven was zoned forty-miles-per-hour.

Officer Hyatt testified that he followed the truck for about one-half mile when it turned into a brickyard and went over a hill. According to Officer Hyatt, as he crested the hill behind the truck, he saw the defendant leaving the truck from the driver's side and the passenger leaving from the passenger's side. Officer Hyatt remained in his cruiser and followed the defendant as he ran for approximately one hundred yards. When he could no longer follow in the cruiser, Officer Hyatt continued the chase on foot. He chased the defendant on foot approximately one hundred yards before discovering him next to some railroad tracks. At that point, Officer Hyatt took the defendant into custody. The passenger was not apprehended.

The defendant continued to identify himself as Brandon Wood and he was booked under that name upon his arrival at the jail. Officer Hyatt returned to the jail later that day after the defendant revealed his true identity as Gregory Mullins. When Officer Hyatt performed a computerized records check of that name, he discovered that the defendant's Virginia driver's license had been suspended.

On cross-examination, Officer Hyatt stated that the second time he saw the pickup, he was initially about thirty yards away. By the time it passed him, it was only about two car lengths away. Officer Hyatt's interior car light was on; there was no interior light on in the pickup. Officer Hyatt acknowledged that he was facing the passenger side of the pickup when it passed but insisted that he was able to see the defendant by the street light. He stated that his patrol car's video camera was not working on the day in question and that he had reported the malfunction to the police department Quartermaster, Kevin Kelly.

Jill Mashburn stated that she worked as a jailer when the defendant was incarcerated pending trial on the instant charges. According to Ms. Mashburn, the defendant identified himself to her as Gregory Mullins while making a telephone call.

Ken Smith testified that he worked for the Virginia Department of Motor Vehicles and was the record custodian for his district. He stated that the defendant's license had been suspended in March 2003, May 2003, and August 2003. The defendant's license remained in suspended status at the time of the instant offenses.

The defendant testified that he had been at home on the evening in question when David Sampson telephoned and asked him for a ride. The defendant claimed that he told Sampson that he did not have a vehicle and Sampson suggested that they borrow a neighbor's truck. According to the defendant, he got a ride to Sampson's house and the two walked to a neighbor's house, where they were given the key to the brown Nissan pickup. Sampson and the defendant then left in the truck with the defendant driving.

The defendant essentially corroborated Officer Hyatt's testimony about the first stop. He admitted having given the officer a false name, one he had "just made . . . up," explaining that he was on probation at the time and was afraid of being sent back to jail if he revealed his actual name. The defendant stated that he did not know that the vehicle was not properly registered and that he did not realize that his Virginia driver's license had been suspended.

The defendant also claimed that he leaned into the passenger's side of the police cruiser when he signed the citation and that he saw the video camera working. The defendant stated that he asked Officer Hyatt if the camera was working and the officer replied, "Yeah, why you want to be on Candid Camera[?]" The defendant acknowledged that Officer Hyatt told both he and Sampson that neither one of them was to drive the vehicle again and that if he saw either of them doing so, they would be arrested. The defendant testified that he and Sampson tried to telephone someone to give them a ride but were unsuccessful. He stated that they began walking but quickly became afraid of being accosted due to the neighborhood in which they found themselves. According to the defendant, as they passed back by the truck Sampson said, 'We're going to jump in this truck and take off." The defendant claimed that Sampson then got behind the wheel of the truck and the defendant got into the passenger's seat.

The defendant acknowledged that he saw Officer Hyatt following them and claimed that he told Sampson to slow down because they would not be able to outrun the officer. He testified that when they stopped, he got out of the passenger's seat and ran. The defendant insisted that Officer Hyatt pulled around the parked truck, stopped, and told the driver to stay in the truck before chasing him on foot. The defendant stated that he tried to hide by laying down in some weeds but was discovered by Officer Hyatt, who told him "if [he] moved he was going to put a bullet in [him]." The defendant claimed that the officer began "pounding" him, put handcuffs on him, and "threw" him into the police car.

The defendant stated that Officer Hyatt was parked "a good 150 f[ee]t" away when they passed by him the second time and that he was three car lengths behind them when the defendant exited the vehicle. The defendant stated that he ran from the officer and later provided a false name because he was on probation and did not want to return to jail.

The defendant claimed that Officer Hyatt knew that he was not the driver of the truck, but told him that he was "charging [him] with everything" because Sampson had gotten away. The defendant stated that he became angry and called Officer Hyatt a derogatory name. He claimed that he told Officer Hyatt that he was a "dummy" because the officer's video camera would prove that he had not been driving the truck the second time. The defendant stated that Officer Hyatt then replied, "Oh, yeah, we'll see about that." The defendant insisted that Officer Hyatt told him at the preliminary hearing that "he didn't have [a] camera, the equipment [was]n't working in the car."

On cross-examination, the defendant reiterated that Officer Hyatt had framed him, had beaten him, and had lied during his testimony. The defendant acknowledged having been convicted of twelve counts of theft, two counts of second degree burglary, four counts of burglary, three counts of grand larceny, one count of petit larceny, two counts of storehouse breaking, and one count of breaking and entering with intent to commit a felony. He explained, however, that he had pled guilty to all of those charges because he had committed the offenses and had proceeded to trial in this case because he was innocent of the charges arising from Officer Hyatt's second stop of the truck. He also admitted having repeatedly lied about his identity in connection with these charges but insisted that his testimony was truthful.

Officer Kevin Kelly was also called by the defense. Officer Kelly testified that he was the Quartermaster for the Kingsport Police Department, which position includes taking care of the video equipment in the police cruisers. He stated that he had no written record of having performed a repair on Officer Hyatt's video camera and did not recall Officer Hyatt asking for his camera to be repaired. He did state, however, that Officer Hyatt's camera was "on the list to be repaired." He did not remember when it was added to the list.

The state recalled Officer Hyatt on rebuttal. He stated that when he pulled the brown truck over the first time, the defendant had signed his citation at the front of Officer Hyatt's police cruiser. He explained that only other officers were allowed near his driving compartment because he was a member of the SWAT team and had weapons in his vehicle. He testified that the defendant "never"

-4-

leaned into the cruiser. Officer Hyatt also denied having beaten the defendant and denied having told the defendant that he would charge him with everything because the other man had gotten away.

Based upon the initial stop of the truck, the defendant was convicted of violating the vehicle registration law, driving on a suspended license, and criminal impersonation. Based upon the second stop, the defendant was convicted of violating the vehicle registration law, speeding, driving on a suspended license, felony evading arrest, misdemeanor evading arrest, and criminal impersonation.

**I**

In his first issue, the defendant challenges the sufficiency of the evidence supporting the following convictions arising out of the second stop: violating the vehicle registration law, speeding, driving on a suspended license, and felony evading arrest. He asserts that the proof of his identity as the driver of the brown pickup on the second occasion was not sufficient to support these convictions. The state disagrees.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

In our view, the defendant's identity as the perpetrator of the challenged offenses is sufficient to sustain the convictions. The defendant has essentially asked this court to reevaluate the credibility of the testimony. "Issues of identity and credibility are classic jury questions." State v. Joseph B. Thompson, No. E2002-00061-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Mar. 17, 2003). The defendant's trial was, for all intents and purposes, a swearing match between the defendant and Officer Hyatt. The jury chose to believe Officer Hyatt's version of the events, as was its prerogative. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). The eyewitness testimony of Officer Hyatt identifying the defendant as the perpetrator of the challenged crimes was sufficient to support the jury's verdict of guilt beyond a reasonable doubt. Accordingly, this issue is without merit.

**II**

As his final issue, the defendant contends that dual convictions for misdemeanor evading arrest and felony evading arrest violate principles of double jeopardy under the Tennessee Constitution. The state disagrees.

The double jeopardy clause of the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, Article 1, section 10 of the Tennessee Constitution provides that "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. 1, § 10. Our supreme court has noted that "three fundamental principles underlie double jeopardy: (1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense." State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996) (citations omitted). Proof that the offenses have the exact same statutory elements is not required to establish that offenses are the "same" for double jeopardy purposes. Id. at 379 (citing Jeffers v. United States, 432 U.S. 137 (1977)). Our high court observed that "whether two offenses are the 'same' for double jeopardy purposes depends upon a 'close and careful analysis of the offenses involved, the statutory definitions of the crimes, the legislative intent and the particular facts and circumstances.'" Id. (quoting State v. Black, 524 S.W.2d 913, 919 (Tenn. 1975)). Finally, our supreme court noted that while appellate review must be guided by the test announced in Blockburger v. United States, 284 U.S. 299, 304 (1932), that test is not conclusive of legislative intent and the reviewing court must also examine (1) whether there were multiple victims involved; (2) whether several discrete acts were involved; and (3) whether the evil at which each offense is directed is the same or different. Denton, 938 S.W.2d at 378-79. The Blockburger test provides that "[w]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." Blockburger, 284 U.S. at 304.

Recently, in State v. Prentice C. Calloway, No. M2004-01118-CCA-R3-CD (Tenn. Crim. App., at Nashville, June 2, 2005), this court merged the defendant's conviction for misdemeanor evading arrest into one for felony evading arrest on the grounds that the dual convictions violated double jeopardy. In that case, the defendant's flight from the police occurred as follows:

> Officer Martin activated his emergency equipment and notified the dispatcher that he was pursuing the vehicle. Defendant exited the store's parking lot into a children's playground. Officer Martin said that the children who were playing on the playground managed to get out of the way of the vehicles. Defendant continued driving at a high rate of speed through the playground and into another parking lot. Defendant then drove across University Court and entered another field on the other side of the street. Officer Martin said that he saw several people in the field running away from Defendant's vehicle. Defendant then drove into the courtyard of the apartments on University Court. Defendant and his passenger jumped from the vehicle and began running. Officer Martin stopped his vehicle and began pursuing the two men. He notified the dispatcher that he was then on foot and requested a police officer as back-up. Officer Martin said that Defendant was wearing a blue and

white shirt and a dark-colored baseball cap. Officer Martin said that he saw a gun between the two running men but could not tell which man was holding the gun.

Slip op. at 3 (emphasis added). On appeal, the defendant argued that the two evading arrest convictions were part of a single criminal episode, while the state contended that the flight from police could be divided into two discrete acts – one in a motor vehicle and one on foot. This court, however, agreed with the defendant:

> The offenses, however, did not involve multiple victims or multiple episodes. Neither misdemeanor evading arrest nor Class E felony evading arrest involves a "victim" per se. See State v. Cullop, 2001 Tenn. Crim. App. LEXIS 298, No. E2000-00095-CCA-R3-CD, 2001 WL 378543, at *8 (Tenn. Crim. App., at Knoxville, Apr. 17, 2001), no perm. to appeal filed; State v. Brandon Patrick, 2005 Tenn. Crim. App. LEXIS 225, No. E2003-02382-CCA-R3-CD, 2005 WL 544738, at *5 (Tenn. Crim. App., at Knoxville, Mar. 8, 2005), no perm. to appeal filed.

> The State strongly urges that two discrete acts of flight occurred that afternoon, each subject to punishment. The first act began when Defendant drove away from Officer Martin after he activated his emergency lights/equipment, and ended when Defendant jumped out of the moving car. The second discrete act under the State's theory thus started as soon as Defendant began to flee on foot and ended with his apprehension in an apartment building's stairwell. Defendant, on the other hand, argues that a defendant's chosen methods of flight during a single episode determine the degree of punishment and not the number of offenses. Based on our review of the proof presented at trial, we conclude that the chase giving rise to both offenses was one continuous criminal episode rather than two discrete acts capable of supporting multiple convictions.

> Nor can we conclude that the respective legislative purposes of the misdemeanor evading arrest and the Class E felony evading arrest address different concerns. The evil at which the statute is directed is the same whether one flees on foot or motor vehicle, that is, to discourage flight from a police officer performing his or her official duties. The fact that punishment is enhanced if the suspect flees in a motor vehicle rather than by some other means of locomotion does not alter the general evil the statute seeks to prevent. See State v. Jimmy Lee Cullop, Jr., 2001 Tenn. Crim. App. LEXIS 298, No. E2000-00095-CCA-R3-CD, 2001 WL 378543, at *8 (Tenn. Crim. App, at Knoxville, Apr. 17, 2001) (The Class E felony evading arrest statute addresses "those who have refused to yield to a law enforcement officer").

Slip op. at 8.

In our view, this case is indistinguishable from <u>Calloway</u>. The defendant initially fled from Officer Hyatt in his pickup truck, but then resorted to flight on foot after reaching the brickyard, with no break in between. Thus, the defendant's flight was "one continuous criminal episode rather than two discrete acts capable of supporting multiple convictions." <u>See</u> <u>id.</u> In consequence, the conviction for misdemeanor evading arrest must be merged into the conviction for Class E felony evading arrest.

Accordingly, the judgment of the trial court is affirmed as modified.

_____
GARY R. WADE, PRESIDING JUDGE