STATE of Tennessee, Appellee,

v.

Laron Ronald WILLIAMS,
Defendant-Appellant.

Supreme Court of Tennessee,
at Nashville.

Aug. 29, 1983.

Rehearing Denied Oct. 3, 1983.

James F. Butler, Billy Jack Goodrich, Charles Patterson, Jackson, for defendant-appellant.

William M. Leech, Jr., Atty. Gen. and Reporter, Kymberly Lynn Anne Hattaway, Asst. Atty. Gen., Nashville, George W. Hymers, Dist. Atty. Gen., James G. Woodall, Asst. Dist. Atty. Gen., Jackson, for appellee.

## OPINION

DROWOTA, Justice.

The Defendant, Laron Ronald Williams, appeals his conviction of first degree murder, for which he was sentenced to death, and his conviction of first degree burglary, for which he was sentenced to no less than ten nor more than fifteen years in the state penitentiary. He presents to this Court several issues for review, all of which we have carefully studied and found to be without merit.

Since the Defendant challenges the sufficiency of the evidence for his convictions, we summarize the evidence presented at trial. On Friday, May 15, 1981, at about 8:20 a.m.,[1] Father John Jay Jackson was

---

1. When Father Jackson had not appeared by 8:20 to celebrate an 8:10 a.m. Mass, the parish bookkeeper unlocked the back door to the rectory and went inside. He found the priest lying on the floor of the den four feet inside the door.

found dead inside the rectory of St. Mary's Catholic Church in Jackson, Tennessee. The pockets of his clothing were pulled out, and coins were scattered on the floor of the den and in the hallway. A sliding glass door which opened onto a screened-in porch had been shattered; and scattered papers and an overturned potted plant on a coffee table indicated there had been a struggle. In addition, the drawers of a desk located in the bedroom area of the rectory had been pulled out and thrown on top of the desk with their contents in disarray. Outside, the footprints of someone wearing tennis shoes led from the rectory to a nearby dumpster, then across the Highway 45 Bypass to a building called Watkins Tower.

The pathologist and medical examiner testified that Father Jackson died between 8:00 and 8:30 p.m. on Thursday, May 14. The autopsy revealed he died as a result of a gunshot wound to the back of the right shoulder. There was a second, nonfatal gunshot would in the left shoulder. Scrapes on the body indicated the priest had struggled with his assailant, and lacerations on the priest's head were consistent with blows from a blunt instrument such as a gun.

On Thursday night, May 14, Father Jackson ate dinner with the Timby family and left between 8:00 and 8:10 p.m. It takes approximately three minutes to walk from the Timby residence to the rectory. Ed Bendoski, a resident of St. Mary's Manor, a home for retired persons located next to the rectory, testified that at 8:22 p.m. on the evening of May 14, he and his wife looked outside the window of an eighth floor lounge at the manor, which faces the Highway 45 Bypass. He saw a car parked in the southwest corner of the parking lot of Watkins Tower across the highway from the Manor. Noting that it was unusual to see a car parked in that area after business hours, Bendoski and his wife proceeded to their apartment located on the eighth floor of the manor. At approximately 8:24 p.m., while looking from a window in the hallway of the eighth floor, Bendoski saw a tall black man approach the dumpster located on the ground. This man lifted up both of the lids to the dumpster, took a box out of the dumpster, reached under his belt or shirt and then placed something into the box. Then he walked "in a big hurry" toward the bypass. Police later found a cardboard box containing two coins just off the corner of the Watkins Tower parking lot, across the Bypass from St. Mary's Manor.

Bendoski testified that at the time he saw the man at the dumpster, it was dusk. However, the area surrounding St. Mary's Manor, from the dumpster to the highway, is well lighted and was illuminated at the time he saw the man. As Bendoski stood 50 to 55 feet from the ground and the dumpster was 50 to 60 feet from the building, he observed the man at the dumpster at an angle. The man wore a cap with a bill, a jacket, and dark pants and shoes. His hair was long. At trial, Bendoski positively identified the Defendant as the man he had seen.

On cross-examination, Bendoski testified he watched the man for approximately four or five minutes. During that period of time, he saw the Defendant's face from the side on two or three occasions, some seven to eight seconds each time. When the Defendant walked around the dumpster, Bendoski was able to see the Defendant's face from the front. Bendoski told an investigator that he could identify the man he saw at the dumpster, but apparently this information didn't register with the investigator for the police never made an attempt to ascertain whether he could identify the Defendant or anyone else from photographs or a lineup.

On Friday evening, May 15, the Defendant sold a .38 Smith & Wesson revolver to Evan Chapman, owner of Chat's market and Cafe, in Jackson. Chapman testified the Defendant was wearing blue jeans, a short jacket, tennis shoes, and a little hat. The Defendant indicated he acquired the pistol as a security guard in California and that he wanted to sell it because he needed the money. He asked for sixty to seventy dollars for the gun, which was worth be-

tween two and three hundred dollars on the open market. Chapman gave the Defendant only half the amount he asked for, pending a police check of the gun. In addition to selling Chapman the unloaded gun, the Defendant gave him four rounds of ammunition. When the check revealed that the gun was one missing from the Memphis Police Department,[2] the police had Chapman identify the man who sold him the gun from six photographs. On the morning of May 17, the police arrested the Defendant, who was wearing a jacket, pants and tennis shoes.

Ballistics tests revealed that the bullets taken from the fatal wound and from the wall in the rectory had been fired from the revolver sold to Chapman. Hairs taken from the Defendant's jacket were indistinguishable from Father Jackson's hair.[3] The hairs recovered from the Defendant's jacket had been forcibly removed. None of the fingerprints found inside the rectory, however, matched the Defendant's fingerprints. Investigators did discover impressions which appeared to have been made by gloved fingers on several pieces of the glass from the broken sliding door and on the door itself. None of the shoeprints found by the police matched the Defendant's tennis shoes. The police were unable to locate the tennis shoes which they believed made the shoeprints.

The Defendant presented alibi witnesses. Howard Williams testified he and the Defendant were together on Thursday May 14, from 6:00 to 10:30 p.m. They played pool, drank and danced at the Carousel Club and Chat's Place. An employee of Chat's Place remembered the Defendant being there between 8:00 and 9:00 p.m., or perhaps a little later, because a dispute arose between the Defendant and another person over a pool

game. At trial, the state read a statement by the Defendant denying any knowledge of the crime or the gun and telling of his activities on May 14. The Defendant's statement to the police was inconsistent with his witnesses' alibi testimony. In the statement, the Defendant said he was with a guy called "Hambone" most of that night. The Defendant did not testify.

Roderick Elmore, an inmate of the Shelby County Jail awaiting trial on a charge of armed robbery, came into contact with the Defendant when they were both incarcerated in June of 1981. At that time, Elmore overheard portions of a conversation between the Defendant and an unnamed individual. During the course of this conversation, the Defendant stated he had been driven to Jackson by his girlfriend. The Defendant also stated he was on the grounds of the rectory and that he had sold a pistol to someone in Jackson. Elmore, who could not hear the entire conversation, did not hear the Defendant say what time he was at the rectory, whether anything happened to him at the rectory, whether he came into contact with anyone at the rectory or whether he obtained anything of value while he was at the rectory. Elmore testified he made no deals with the prosecution in Memphis or in Jackson in exchange for his testimony at the instant trial. Though he could not see the Defendant as he spoke, Elmore was positive the voice was the Defendant's.

The only proof introduced at the sentencing hearing was two certified copies of Defendant's convictions for first degree murder in Shelby County and second degree murder in Davidson County. These documents were stipulated to by the State and defense counsel.

2. Sgt. Gooch of the Memphis Police Department testified that the .38 caliber revolver belonged to the Memphis Police Department and had been missing since May 12, 1981.

It was properly kept from the jury in this case that the revolver belonged to Lt. Cox, who was fatally shot with his own gun by the Defendant on May 12. *State v. Williams,* Shelby Criminal. See also footnote 6.

Louise Hawkins, an acquaintance of the Defendant, testified that she drove the Defendant to Jackson the evening of May 12, and rented a room for him at the Regency Inn for one week. She returned to Memphis that evening.

3. Father Jackson's body was exhumed on November 16, 1981, and hair was taken from the top and sides of the head.

## I

 The Defendant's first four issues concern whether there is sufficient proof to sustain his convictions. The principles which govern our review of a conviction by jury are settled. A jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory. *State v. Hatchett,* 560 S.W.2d 627 (Tenn. 1978); *State v. Townsend,* 525 S.W.2d 842 (Tenn.1975). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832 (Tenn. 1978). A verdict against the Defendant removes the presumption of innocence and raises a presumption of guilt on appeal, *State v. Grace,* 493 S.W.2d 474 (Tenn.1973), which the Defendant has the burden of overcoming. *State v. Brown,* 551 S.W.2d 329 (Tenn.1977).

 Where the sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Rule 13(e), T.R.A.P. Moreover, a conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." *State v. Crawford,* 225 Tenn. 478, 484, 470 S.W.2d 610, 612 (1971).

To support his argument, Defendant points to several seemingly loose ends in the proof presented at trial. First, he directs our attention to the State's theory that the footprints outside the rectory were made by the victim's killer. But these prints did not match the soles of the Defendant's shoes. Second, the pistol used in the homicide did not have the Defendant's fingerprints on it. Third, the ballistics report on the bullets fired from the gun which the Defendant sold to Evans Chapman was not perfect.

While the bullets matched those retrieved from the victim's body and from the room in which the body was found on many points, there were other points that did not match. Fourth, he points to the testimony of FBI agent Malone, who examined and compared hair samples taken from the victim and from the clothing of the Defendant. Malone testified the hairs were indistinguishable and that they were probably from a common source, but that this sort of analysis did not constitute a basis for positive personal identification. Fifth, he attacks Ed Bendoski's testimony as "unbelievable." Sixth, he contends that according to the witnesses, the Defendant was not at the rectory at St. Mary's Church at the time of the murder.

 Mindful of these seemingly loose ends, we nevertheless remind the Defendant our review must be limited to whether a rational fact finder could find him guilty of the charges beyond a reasonable doubt. There is no requirement that the State's proof be uncontroverted or perfect. For the most part, the Defendant's attacks bear on the weight of the evidence. For example, whether Bendoski's testimony is believable or not, and whether it "smacks of an overzealous desire to assist the State in punishing someone for the death of Father John J. Jackson" are not questions for an appellate court. The jury's province being precisely that of determining a witness's credibility, we may not substitute our judgment on appeal for the jury's judgment. Bendoski testified he saw the Defendant at the dumpster near the retirement home, and the jury believed him. Likewise, agent Malone's opinion regarding the hair samples was for the jury to ponder, weigh, discard or accept. We may assume they chose the last. As regards the absence of the Defendant's fingerprints on the gun or at the scene of the crime, Sgt. Gary Randy Winbush's testimony that glove prints were found would offer an explanation. And though there were witnesses who testified the Defendant's whereabouts were other than the St. Mary's rectory at the time of the homicide, there was one witness who

testified he saw the Defendant outside the rectory, and another, Elmore, who testified he overheard the Defendant admit to being at St. Mary's rectory. The jury chose not to believe the alibi witnesses.

■ A witness who placed the Defendant at the scene of the crime shortly after the homicide, an admission by the Defendant that he was on the premises, the forcefully removed hair of the priest found on the Defendant's clothes, the Defendant's sale of the murder weapon to Evan Chapman the day after the murder, the inconsistent accounts of the Defendant's alibi witnesses and his own account of his whereabouts, Bendoski and Chapman's descriptions of the black man wearing a jacket and a little billed hat—considering all this in the light most favorable to the State, we are convinced a rational jury could find the Defendant guilty beyond a reasonable doubt.

## II

■ The Defendant argues the trial court should have stricken Bendoski's testimony because the State failed to comply with his discovery motion "to state specifically . . . any eyewitnesses of which the State has knowledge and who allegedly witnessed the crime." Prior to trial the State had made the Defendant aware of Bendoski's role as a witness and of the substance of his testimony. Bendoski's name and address appear on the indictment.[4] The State was not aware Bendoski could identify the Defendant until Bendoski saw the Defendant through the glass of the court room door during the trial. The State provided the Defendant with a copy of a police report wherein Bendoski's statement was recorded in narrative form. The evidence shows the State provided the Defendant with as much information as it had before trial. Moreover, Bendoski was not an eyewitness to the crime. *Cf. Pannell v. Sovereign Camp, W.O.W.,* 171 Tenn. 255, 102 S.W.2d 50 (1937). He only saw the Defend-

ant at the dumpster after the crime had been committed. And so the State's response to the Defendant's discovery motion, stating "[T]he State has no knowledge of eyewitnesses to this murder," was a proper and correct response. The Defendant was not unfairly surprised by Bendoski's in-court identification.

■ The Defendant contends his Sixth Amendment right to the effective assistance of counsel was abridged by the trial court's denying his motion for funds to secure the assistance of an expert in the field of hair analysis. The United States Supreme Court, in *United States ex rel. Smith v. Baldi,* 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953), held that a state is under no federal constitutional obligation to provide expert pre-trial assistance to an indigent defendant. The defendant, in *Baldi,* requested that the trial court appoint him a psychiatrist for a pre-trial examination. In upholding the trial court's refusal[5] to do so, the Court stated, "Psychiatrists testified. That suffices." 344 U.S. at 568, 73 S.Ct. at 394.

We have held this state's constitution preserves no such right. *Graham v. State,* 547 S.W.2d 531 (Tenn.1977). The Defendant points to, and our research turns up, no statute which would grant an indigent criminal defendant a right to this assistance. Although the Defendant "urge[s] this Court to adopt a rule of law allowing an indigent defendant funds for expert assistance," we decline to do so. "Essentially this is a matter that addresses itself to the judgment and discretion of the legislature. Thus far it has not seen fit to provide such services to indigent defendants." *Graham,* 547 S.W.2d at 536.

■ As his seventh issue for review, the Defendant argues the trial court erred in declaring Sgt. Gary Randy Winbush an expert in the field of fingerprint analysis. We find no error in the ruling. The qualification of an expert witness is a matter

---

4. At page 44 of Defendant's brief, he acknowledges he had sufficient time to investigate the witnesses listed in the indictment.

5. There was some factual question in *Baldi* about whether the Defendant properly moved the court for the expert assistance.

within the sound discretion of the trial court, and a decision on the matter will not be reversed on appeal absent a clear abuse of such discretion. *Murray v. State,* 214 Tenn. 51, 377 S.W.2d 918 (1964). Winbush was graduated from Jackson State Junior College. He was also a graduate of the Institute of Applied Science (a one-year correspondence course), the Advanced Latent Fingerprint School, taught by the FBI (a three-week course), and the TBI Law Enforcement Academy's Fingerprint School, taught by the FBI (a two-week course). He has attended various seminars organized by law enforcement agencies specializing in the area of fingerprint analysis, and has worked as a fingerprint examiner for more than six years. It is unclear to us what more experience the Defendant would require. Quite frankly, we are at a loss as to the importance of this issue, since Winbush testified the Defendant's fingerprints were found in no relevant places.

### III

Upon the Defendant's arrest on Sunday May 17, 1981, he was taken immediately to the City Police Station in Jackson, Tennessee, where he was read his rights guaranteed by the federal constitution and acknowledged in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He waived his rights and was interviewed by officer Holt of the department. This interview was taped and later transcribed. The Defendant's handwritten signature does not appear on the transcription. A signed waiver and a redacted [6] transcript of the interview were admitted into evidence over the Defendant's objection that the statement did not bear the Defendant's signature, that it was irrelevant, and that there was no proof the tape and the transcript were what they purported to be.

The Defendant presented alibi witnesses to account for his whereabouts after his arrival in Jackson around May 12th. The part of the transcript in which

the Defendant tells the interviewing officer of his movements about the city after coming to Jackson was read in open court as evidence for the State's case. The use of the statement in this case was for the purpose of showing the inconsistency between the Defendant's statement and the statements of the alibi witnesses. There was no error in admitting the statement. Although there is some limitation on the Defendant's placing his own statement into evidence, such statements being self-serving and lacking any guarantee of testimonial trustworthiness, *Hall v. State,* 552 S.W.2d 417 (Tenn.Cr.App.1977), there is no similar limitation on the State's offering a defendant's declaration which was freely given. *Johnson v. State,* 598 S.W.2d 803 (Tenn.Cr.App.1979). And it is because the Defendant's statement was freely given, with full knowledge of his right to an attorney and his right to remain silent, that there is no violation of his Fifth Amendment privilege against self incrimination.

The Defendant contends the trial court erred in denying his motion in limine to exclude the expert testimony of FBI agent Malone concerning his finding after analyzing the hair samples given him. Defense counsel objected to the admission of this testimony on the grounds that the prejudicial impact of this testimony outweighed the probative value in violation of due process, and that the testimony of the agent necessarily constituted speculation. The Defendant cites *United States v. Brady,* 595 F.2d 359 (6th Cir.1979), and *United States v. Brown,* 557 F.2d 541 (6th Cir.1977), in support of his contention. These cases set forth a four-prong test for determining the admissibility of expert testimony. *Brady* and *Brown* require that the witness be an expert, that the subject matter of the witness's testimony be proper, that the subject matter of the witness's testimony conform to a generally accepted explanatory theory, and that the probative value of the witness's testimony outweigh its prejudicial ef-

---

**6.** Redaction removed references to William's recent escape from a correctional institution and to the murder of Lt. Cox in Memphis,

which resulted in his conviction of first degree murder in Shelby County.

fect. The Defendant argues the last two tests are not met.

We agree with the State that the testimony under attack here was highly probative to establish the fact of the Defendant's identity as the perpetrator of the crime. And although Malone testified that hair analysis does not provide a positive personal identification, such as fingerprint analysis, he testified it would be highly unlikely that the hair from any two persons will exhibit the same characteristics. However, if the hair from two individuals matches, it would also be highly unlikely that both individuals would be in a position to deposit their hair in the same place. It was for the jury to give the testimony as much weight as it thought the testimony merited. The Defendant's argument stresses the unreliability of the hair analysis tests. Yet, in *State v. Melson,* 638 S.W.2d 342 (Tenn.1982), we considered the reliability of this test and found it satisfied the criteria of *Brady* and *Brown.*

### IV

The Defendant maintains two errors were committed during the sentencing phase of his trial. During closing arguments, Mr. Hymers, counsel for the State, argued, in part, as follows:

The Court has instructed that we are considering paragraphs two and seven [of T.C.A. 39–2–203(i)].... As to paragraph Two, the Defendant was previously convicted of one or more felonies other than the present charge which involved the use of threat or violence to the person.

Now, Exhibit No. [1], has to do with the Davidson County case, and that reflects that a plea of guilty was entered on January 4, 1979, to Second Degree Murder charged in which it was charged that Tera L. Wedlaw had been murdered. The Defendant pled guilty and a sentence of ten years was given. Exhibit No. 2, has to do with a murder conviction in the first degree in which the death penalty was inflicted, and that has to do with the judgment that was rendered on 11–6–81,

in Shelby County, at Memphis, Tennessee, and it charged Laron Ronald Williams with murdering a police officer in the line of duty in that county.

Mr. Woodall, co-counsel for the State, argued, in part, as follows:

[The Defendant] spent five minutes deliberately, and with malice aforethought striking down Father John J. Jackson in the rectory house; and on November 6th, 1981, was found guilty for the deliberate, premeditated murder of Lt. Edward Cox of the Memphis Police Department when he took a gun and blew his brains out, and prior to that he was found guilty in Davidson County, Tennessee, of the murder of a young lady.

There was no objection made at any point during the State's arguments. There was no objection made at the close of the arguments.

The first objection made about the impropriety of the State's arguments is made before this Court. Here, the Defendant objects to the state's mentioning the prior death sentence and to Mr. Woodall's phrase "blew his brains out." As there is no evidence in the record about the details of the killing of officer Cox, Mr. Woodall's comment was improper. *See Russell v. State,* 532 S.W.2d 268 (Tenn.1976). This error does not require a reversal of the Defendant's sentence, however, as he has shown no resulting prejudice. In a consideration of whether improper conduct on the part of the State requires reversal, a court may look to several factors, such as the effect of curative measures taken by the trial court, the intent of the prosecution, the cumulative effect of the improper conduct and any other errors in the record, and the relative strength of the case. *See Judge v. State,* 539 S.W.2d 340 (Tenn.Cr. App.1976). Our review of the State's arguments convinces us that counsel were otherwise careful in their choice of words, considering the facts of this case are lamentable. The comment was isolated and Mr. Woodall's argument and Mr. Hymer's argument were in all other respects temperate.

As regards Mr. Hymers' comment about the Defendant's prior death sentence, we reach the same result. The State's counsel argued only from the evidence admitted at trial. The Defendant stipulated to his past murder convictions and the sentences imposed for those convictions. If the Defendant objected to this information being commented upon, he should not have agreed to the sentences being made a part of the record. We wish to point out, however, that the fact of a pending prior death sentence should not be admitted as evidence except by agreement.

The fact of the prior murder convictions coupled with the present first degree murder conviction is statutorily sufficient to support a sentence of death. On review, it is not for this Court to speculate about the thought processes of the jury. We review the evidence and the statutory requirements and insure that the jury has been instructed properly on the law. The essence of the Defendant's argument is that even in the face of the past murder convictions, there is some chance, however slim, that the jury might have given him life had it not known of his past sentence of death. But such an argument ignores the new death statute's goal of eliminating capriciousness in the deliberating process. While the jury has the responsibility of determining the sentence, its decision is guided by the statute. It is only after finding at least one of the aggravating circumstances that the death penalty may be given. In the present case the Defendant presented no evidence of mitigating circumstances, and the aggravating circumstances were strong.

## V

The Defendant challenges the constitutionality of the death penalty statute on several grounds. All the arguments, however, have been reviewed by this Court in past decisions, and there is no merit to them. The death penalty statute is constitutional. *Houston v. State,* 593 S.W.2d 267 (Tenn.1980), *cert. denied,* 449 U.S. 891, 101 S.Ct. 251, 66 L.Ed.2d 117 (1980). *State v. Pritchett,* 621 S.W.2d 127 (Tenn.1981); *State v. Melson,* 638 S.W.2d 342 (Tenn. 1982); *State v. Simon,* 635 S.W.2d 498 (Tenn.1982).

The Defendant's convictions of first degree murder and first degree burglary are affirmed. The sentence of not less than ten nor more than fifteen years in the state penitentiary for burglary and the sentence of death for murder in the first degree are affirmed. The date of execution is fixed for November 29, 1983, unless stayed or otherwise ordered by this Court or other proper authority. Costs are assessed to the Defendant.

FONES, C.J., HARBISON, J., and RUSSELL, Special Justice, concur.

BROCK, J., concurs in part and dissents in part.

BROCK, J., concurring in part and dissenting in part.

For the reasons stated in my dissent in *State v. Dicks,* Tenn., 615 S.W.2d 126 (1981), I would hold that the death penalty is unconstitutional; but, I concur in all other respects.