# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs June 19, 2002

## STATE OF TENNESSEE v. TERRY DEWAYNE OGLE

### Appeal from the Circuit Court for Blount County
### No. C-12885     D. Kelly Thomas, Jr., Judge

---

### No. E2001-02029-CCA-R3-CD
### August 20, 2002

---

The defendant, Terry DeWayne Ogle, indicted for one count of aggravated assault, was convicted of the lesser included offense of assault. The trial court imposed a sentence of 11 months and 29 days. In this appeal of right, the defendant challenges the sufficiency of the evidence. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

George H. Waters, Maryville, Tennessee, for the appellant, Terry DeWayne Ogle.

Paul G. Summers, Attorney General & Reporter; Peter M. Coughlan, Assistant Attorney General; and Edward P. Bailey, Jr., and Kirk Andrews, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Shortly before midnight on November 12, 1999, Deputy Geoff King of the Blount County Sheriff's Department observed a two-tone Chevrolet Astro Van turn from a side street onto Highway 321 and into the path of another car. The officer first determined that the van was being driven in excess of the posted speed limit and then saw the van drift across either the center line or fog line of the road approximately four times. Although he did not initiate a traffic stop at that time due to an unusual amount of radio traffic, Deputy King continued to follow the van. At trial, he explained that department policy required all traffic stops to be reported over the radio.

According to Deputy King, the van traveled at a rate of 70 miles per hour in a 55-mile-per-hour speed zone and then made a sudden right turn into the parking lot of a gas station. The officer followed but did not stop the vehicle due to his concern with the number of pedestrians in the parking lot and the "erratic movements of the driver of the van." While sitting in the parking lot, Deputy King made eye contact with the driver of the van, who gestured toward the passenger side

of the van. Deputy King saw an individual in the passenger seat raise his arms. At that point, the driver backed up, almost coming into contact with the cruiser, and drove away at a high rate of speed. The driver ran off of the roadway, overcorrected, and traveled into oncoming traffic, forcing another vehicle onto the shoulder. According to Deputy King, the driver failed to stop at two intersections and turned onto County Farm Road. When there was a break in the radio traffic, the officer activated his emergency lights. The van slowed on Alnwick Drive and turned into a gravel driveway, where it was stopped in front of a house.

Deputy King recognized the driver, who had stepped out of the van, as Sherry Weeks. When the officer ordered her back into the van, she refused and said, "[W]hat the hell [are you] doing in [my] driveway?" Ms. Weeks then walked into the house. The passenger, later identified as the defendant, remained in the van briefly before getting out and walking toward the house. When Deputy King ordered the defendant to return to the van, he attempted to comply but found that the van was locked. The defendant then walked into the house.

At trial, Deputy King testified that he called for assistance after the occupants of the van entered the house. Because only the storm door of the house was closed, he could see Ms. Weeks as she walked around inside the house talking on the telephone. A short time later, Blount County Sheriff's Department Deputy Steve Donald, who had arrived to assist, called the 911 Communications Center and asked the dispatcher to establish telephone contact with the occupants of the residence. When Deputy King talked with Ms. Weeks through the storm door, she refused to come outside and closed the door. Deputy King testified that Deputy Donald then contacted the shift supervisor, Sergeant Tim Wilson. When Sergeant Wilson arrived at the scene, Deputy King left to obtain a warrant for Ms. Weeks arrest.

When Deputy King arrived with the warrant, Sergeant Wilson knocked on the door, informed the occupants of the house that they had a warrant for Ms. Weeks' arrest, and ordered them to open the door. When there was no response, the officers kicked in the door, entered the residence, and found Ms. Weeks sitting on the floor of a bedroom looking at compact discs. The defendant lay on the bed. Deputy Donald informed Ms. Weeks that she was under arrest. When she refused to cooperate, he dragged her, kicking and screaming, from the room. At that point, Deputy King noticed the defendant rise from the bed and walk toward the door of the bedroom with something in his hand. He shouted at Deputy Kevin Condee, whose view of the door was obstructed, to "[W]atch out, he's got something, watch it." Deputy King ordered the defendant to stop and Deputy Condee directed the defendant to show his hands. When the defendant continued to advance toward the officers, Deputy King saw that he held a bat over his left shoulder. Because the defendant was advancing in an "aggressive manner," Deputy Condee shot the defendant. Upon inspection, Deputy King observed that the bullet had gone through the defendant's forearm and entered his abdomen.

Detective Scott Carpenter of the Blount County Sheriff's Department, who investigated the shooting, testified that because an officer was involved in the shooting, the investigative duties were shared by the Blount County Sheriff's Department and the Tennessee Bureau of Investigation. According to Detective Carpenter, crime scene investigators recovered no usable latent fingerprints from the bat which had been seized by the officers. Detective Carpenter, the lead investigator,

acknowledged that he did not personally interview the defendant and relied upon an interview conducted by TBI Agent Michael Cooper.

Deputy Rusty Borden of the Blount County Sheriff's Department, who had helped secure the outside of the residence during the arrest, testified that he heard a scuffle and then a gunshot. Several minutes later, he saw Sergeant Tim Wilson escort Deputy Condee outside. According to Deputy Borden, Deputy Condee then fell to his knees and had to be helped to his car. While Deputy Borden attempted to calm him, Deputy Condee said, "[H]e came at us with a baseball bat, had it cocked and ready, I had to."

Sergeant Wilson, the fourth officer to enter the residence, just behind officers Donald, Condee, and King, witnessed Deputy Donald's removal of Ms. Weeks from the bedroom and heard Deputy King exclaim, "[L]ook out, look out, he's got something in his hands." He then heard Deputy Condee say, "[L]et me see your hands, let me see your hands," followed quickly by a single gunshot. After the defendant fell into the hallway, Sergeant Wilson heard Deputy Condee angrily ask, "[W]hy did you come at me with a baseball bat[?]" Sergeant Wilson testified that he did not see the defendant until he fell into the hallway.

Deputy Kevin Condee, who was standing in a narrow hallway while Deputy Donald removed Ms. Weeks from the bedroom, heard Deputy King remark, "[W]atch him, he's got something in his hands, he's got something in his hands." Deputy Condee, who could not see the defendant from his vantage point, ordered the defendant to show his hands. He explained that when he stepped closer to the bedroom door, he encountered the defendant holding a baseball bat above his right shoulder. Deputy Condee testified that when the defendant continued to advance, he fired a single shot which struck the defendant in the arm. The defendant then fell into the hallway and the bat fell out of his hands over his shoulder. On cross-examination, Deputy Condee conceded that the defendant showed no signs of aggression at any time before he appeared in the doorway with the bat.

Deputy Steven Lynn Donald, who is six feet and four inches tall and weighs over three hundred pounds, was the first to enter the residence, followed by Deputy Condee. According to Deputy Donald, he noticed a light on in one of the bedrooms when he entered the residence. He saw Ms. Weeks seated on the floor in the bedroom and the defendant lying on the bed. After he informed Ms. Weeks that she was under arrest, she refused to leave. Deputy Donald testified that he forcibly removed her from the room. As Deputy Donald left the room, he saw the defendant rise quickly from the bed, keeping his right hand concealed. When he reached the living room, Deputy Donald heard Deputy King say that the defendant had something in his hands. He heard Deputy Condee order the defendant to show his hands and, soon afterward, heard a single gunshot.

The defendant testified that on the night of the shooting, Ms. Weeks had picked him up at his mother's house and driven him to her residence. He claimed that the two stopped briefly at the Smoky View Market to get some cigarettes, but left upon discovering that the store was closed. While in the parking lot of the market, the defendant noticed that a police cruiser was behind them. He claimed that he did not see the cruiser again until it parked behind them in the driveway of Ms. Weeks residence. According to the defendant, Ms. Weeks got out of the van and "had words" with

the officer. The defendant claimed that when he stepped out of the van, the officer "got hateful," and in response, the defendant stated his intention to go inside the house. Before entering the house, the defendant attempted to remove his cigarettes from the van and discovered that the doors were locked. He testified that he then went inside to lie on the bed. He stated that he wasn't worried about the officer's presence, explaining that "I figured [Ms. Weeks would] go to jail and I'd bond her out the next day." He testified that Ms. Weeks refused to go outside and argued with the officers for a long while before returning to the bedroom.

The defendant acknowledged that he heard the officers announce, "[W]e're kicking your door in." He claimed that he woke Ms. Weeks and instructed her to answer the door but she was too intoxicated to stand. He contended that Deputy Donald "grabbed her around the throat with his arm, and drug her to her feet and drug her out backwards." The defendant testified that when he got out of the bed and walked toward the bedroom door, he heard a gunshot and saw blood coming from his arm. After falling to the floor, he looked up and saw Deputy Condee "standing in the bathroom with his gun up to his chest, shaking." The defendant insisted that he did not have a baseball bat in his hands and explained that there were two bats on the back porch only because Ms. Weeks' son played baseball. The defendant claimed that he had never seen the bat the officers produced at trial and insisted that the bat found by crime scene investigators was planted by the officers.

Dr. Charles Harlan, a forensic pathologist, testified on behalf of the defendant. He stated that a single gunshot entered the defendant's right forearm just below the elbow crease, shattered the ulna, and then entered the abdomen near the belly button. According to Dr. Harlan, it would be physically impossible for the defendant to have received a wound of that nature while holding a bat raised over his shoulder. While conceding that he could not ascertain the location of the defendant's arm just before he was shot, it was his opinion that the wound was consistent with his being in a walking motion at the time of the shot.

The defendant contends that the evidence is insufficient to support his conviction for assault. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Initially charged with the aggravated assault of Deputy King, the defendant was convicted of the lesser included offense of assault. Tennessee Code Annotated section 39-13-101 provides that a person who "[i]ntentionally, knowingly or recklessly causes another to reasonably fear imminent bodily injury" is guilty of assault. Tenn. Code Ann. § 39-13-101(a)(2).

Here, Deputy King testified that the defendant walked toward the officers in the hall while carrying a baseball bat. He claimed that he feared that the defendant intended to inflict "bodily harm," and that the defendant continued to advance despite warnings to stop. There was also testimony that the defendant ignored Deputy Condee's repeated requests to show his hands. By its verdict, the jury determined that the defendant acted in a threatening manner sufficient to cause reasonable fear of injury and accredited at least portions of the state's theory. That was its prerogative. This court may neither reweigh the evidence nor reassess the credibility of the witnesses.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE