FILED

12/07/2021

Clerk of the
Appellate Courts

# IN THE SUPREME COURT OF TENNESSEE
June 3, 2021 Session

## STATE OF TENNESSEE v. URSHAWN ERIC MILLER

**Automatic Appeal from the Court of Criminal Appeals**
**Circuit Court for Madison County**
**No. 16-435    Donald H. Allen, Judge**

_____

**No. W2019-00197-SC-DDT-DD**

_____

SHARON G. LEE, J., concurring in part and dissenting in part.

The Eighth Amendment to the United States Constitution protects all citizens, including Urshawn Eric Miller, from being subjected to punishment that is cruel and unusual. A sentence is cruel and unusual, and thus constitutionally prohibited, when it is excessive or disproportionate as compared with sentences imposed in similar cases. Miller was sentenced to death for shooting and killing a store clerk during an attempted robbery. The loss of the store clerk's life is tragic, and Miller deserves to be punished. But Miller and the crime he committed do not fall into the rare category of the "worst of the bad."[1] When compared with other first-degree murder cases, including capital cases, Miller's case is more like cases in which a sentence of life or life without parole was imposed rather than a death sentence. Thus, Miller's death sentence is out of line with the punishment imposed in similar cases, making his punishment cruel and unusual.

Miller's convictions for first-degree murder and other offenses should be affirmed. Under the Eighth Amendment, Miller should not be put to death but should spend the rest of his life in prison.[2]

---

[1] *State v. Nichols*, 877 S.W.2d 722, 739 (Tenn. 1994).

[2] I also do not join in the Court's decision rejecting Miller's challenges to the death penalty and the lethal injection protocol. That aside, the disproportionality and excessiveness of the death penalty here is more than sufficient reason for Miller's life to be spared. In *State v. Irick*, the defendant established that the State's lethal injection protocol would cause serious and needless pain during his execution. 556 S.W.3d 686, 695–97 (Tenn. 2018) (Lee, J., dissenting). I agree with Justice Sotomayor's dissent from the denial of the defendant's application for stay of execution: "If the law permits this execution to go forward in spite of the horrific final minutes that Irick may well experience, then we have stopped being a civilized nation and accepted barbarism." *Irick v. Tennessee*, 139 S. Ct. 1, 4 (2018) (Sotomayor, J., dissenting).

## I.

The Eighth Amendment's ban on cruel and unusual punishment does not allow sentences that are excessive or disproportionate to the penalty imposed in similar cases. Criminal punishment, especially the most severe and irreversible sanction of a death sentence, must be proportional to the crime and the culpability of the defendant. Thus, we limit capital punishment to "offenders who commit 'a narrow category of the most serious of crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) (quoting *Roper v. Simmons*, 543 U.S. 551, 568 (2005)). Because "the culpability of the average murderer" cannot "justify the most extreme sanction available to the State," *Atkins v. Virginia*, 536 U.S. 304, 319 (2002), the death penalty is reserved for only the "worst of the worst"[3] or the "worst of the bad."[4]

To satisfy the Eighth Amendment's guarantee that no citizen will be subjected to cruel and unusual punishment, Tennessee Code Annotated section 39-13-206(c)(1)(D) requires a reviewing court to determine whether a death sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant."[5] This means that we must survey "similar cases" and evaluate any disparity between the relative degrees of culpability and the punishment imposed. A death sentence is excessive or disproportionate under the statute when the nature of the crime and the defendant align more closely with cases in which a life or a life without parole sentence was imposed rather than a death sentence.

---

[3] *Kansas v. Marsh*, 548 U.S. 163, 206 (2006) (Souter, J., dissenting) (citing *Roper*, 543 U.S. at 568).

[4] *Nichols*, 877 S.W.2d at 739; *see also State v. Pruitt*, 415 S.W.3d 180, 224 (Tenn. 2013) (Koch and Lee, JJ., concurring in part and dissenting in part) (quoting *Nichols*, 877 S.W.2d at 739); *State v. Boyd*, 959 S.W.2d 557, 559–60 (Tenn. 1998) (quoting *State v. Middlebrooks*, 840 S.W.2d 317, 343 (Tenn. 1992), *superseded on other grounds by statute*, 1995 Tenn. Pub. Laws, ch. 377, § 1, *as recognized by State v. Stout*, 46 S.W.3d 689, 705–06 (Tenn. 2001)); *State v. Keen*, 31 S.W.3d 196, 208 (Tenn. 2000) ("In fact, *Odom's* legitimate concerns with sufficient narrowing of the death-eligible class of defendants are actually furthered by such an examination, and only in this manner can the sentence of death be reserved for the 'worst of the worse.'" (quoting *State v. Odom*, 928 S.W.2d 18, 27 (Tenn. 1996))); *State v. Bland*, 958 S.W.2d 651, 663 n.10 (Tenn. 1997) ("The Tennessee statutory capital sentencing scheme has been repeatedly upheld against constitutional attack, and, from the raw numbers, appears to be performing its intended purpose of reserving the death sentence for the 'worst of the bad.'" (no citation attributed in original)).

[5] The purpose of this mandated "comparative proportionality review is to identify and invalidate aberrant death sentences." *State v. Godsey*, 60 S.W.3d 759, 793 (Tenn. 2001). Under Tennessee Code Annotated section 39-13-206(c)(1)(A) through (C), we also review every death sentence to determine whether: the sentence was imposed arbitrarily, the evidence supports any findings of aggravating circumstances, and the evidence supports the jury's determination that the aggravating circumstances outweigh any mitigating circumstances.

In some cases, whether a death sentence is found to be disproportionate or excessive depends on how the sentence is reviewed. In *State v. Bland*, 958 S.W.2d 651 (Tenn. 1997), a divided Court narrowed the proportionality review for death sentences by limiting the pool to only first-degree murder cases in which the prosecution sought a death sentence, a capital sentencing hearing was conducted, and the jury decided whether the sentence should be death, life in prison without parole, or life in prison. *See id.* at 666 & n.17. In *State v. Pruitt*, I joined Justice William C. Koch in dissenting from the Court's decision to apply the *Bland* approach to proportionality review and impose the death penalty on the defendant. 415 S.W.3d 180, 223–24 (Tenn. 2013) (Koch and Lee, JJ., concurring in part and dissenting in part). In our view, the proportionality review mandated by Tennessee Code Annotated section 39-13-206(c)(1)(D) required a comparison of similar cases from the pool of *all* first-degree murder cases—not just capital cases. *Id.* at 225. A proportionality review of similar first-degree murder cases ensures that only "the worst of the bad" offenders are executed. *Id.* at 238. By limiting review to only similar capital cases, the *Bland* shortcut defies the plain language of the statute, omits most first-degree murder cases, and fatally skews the basic inquiry of which cases are similar. *See id*. at 230.[6] The question should not be whether Miller's case is "plainly lacking in circumstances" present in capital cases, *cf. Bland*, 958 S.W.2d at 665, because that inquiry assumes that death penalty cases are the most similar cases. And our comparative review should not simply rehash the aggravating and mitigating factors[7] but should concentrate instead on the "nature of the crime and the defendant" as required by section -206(c)(1)(D).

## II.

In reviewing Miller's death sentence for proportionality under section -206(c)(1)(D), we first consider the nature of Miller's crime. He entered a market wearing dark clothing and a facial covering. Pointing his gun, Miller threatened to shoot a clerk if he did not turn over the money in the cash register. Miller then fired a shot in the clerk's direction. As the clerk turned to walk away, Miller shot him in the back of the head and killed him. Miller then fired a third shot in the direction of another clerk, but the shot missed. Miller had three live rounds left in his gun that he did not fire. He could not open the cash register and ran out of the market empty-handed. Miller fled into the woods, threw away his gun, and refused to come out. He grappled with a police dog, which bit him twice. Miller surrendered after an officer struck him on the head with a shotgun and another officer shot him with a taser.

---

[6] Since *Bland* was decided in 1997, this Court has reviewed eighty-one death penalty cases and found the death penalty disproportionate in only one case: *State v. Godsey*, 60 S.W.3d 759. Bradley A. MacLean & H. E. Miller, Jr., *Tennessee's Death Penalty Lottery*, 13 Tenn. J.L. & Pol'y 85, 119 n.97 (2018).

[7] Besides a proportionality review, the Court has to review every death sentence to determine whether the evidence supports a finding of one or more aggravating circumstances and whether these circumstances outweigh any mitigating circumstances. *See* Tenn. Code Ann. § 39-13-206(c)(1)(B)–(C) (2018 & Supp. 2021). These are independent inquiries; the proportionality review should not be conflated with the separate review of aggravating and mitigating circumstances.

Next, we consider Miller's characteristics. Growing up in an unstable family, he had a difficult childhood with a family history of substance abuse and criminal conduct. Miller moved eight times before he was ten years old. His father abandoned him. His mother smoked marijuana while pregnant with him. She mistreated Miller and had a series of abusive men in her life. When Miller was a child, one of his mother's male friends had Miller pour rubbing alcohol on his penis to see him react in pain. He was abused by his alcoholic grandmother who often cared for him. Miller was of low or low-average intelligence (eighteenth percentile), and he dropped out of school in the tenth grade. Miller used alcohol and smoked marijuana excessively for many years. He was diagnosed with antisocial personality disorder, cannabis use disorder, and a history of attention deficit hyperactivity disorder. An expert at his trial concluded that he also suffered from post-traumatic stress disorder. At seventeen, Miller was shot in the back during an attempted robbery. At eighteen, he was the victim of an armed robbery. Miller was previously convicted of armed robbery and sentenced to serve eight years. He was a twenty-six-year-old African-American male when he committed the crime for which he was sentenced to death.

In sum, the essence of this case for proportionality review is that Miller, who had a prior criminal conviction, shot and killed a single victim for pecuniary gain. While reprehensible, the crime did not involve torture, depravity, or other especially cruel conduct. Most defendants with similar characteristics who committed similar crimes have been sentenced to life or life without parole. Very few defendants who committed first-degree murder by shooting a single victim for pecuniary gain have been sentenced to death. Thus, whether we analyze Miller's case by comparing it to similar capital cases (*Bland* approach) or all similar first-degree murder cases (pre-*Bland* approach), the result is the same—Miller's death sentence is disproportionate or excessive.

The official database of Tennessee Supreme Court Rule 12 reports shows 399 reported first-degree murder convictions (excluding Miller's conviction) for single-victim shootings for "pecuniary or other gain" between 1978 and 2021.[8] Defendants in 360 (90.2%) of those cases were sentenced to life or life without parole. Only thirty-nine (9.8%) defendants were *initially* sentenced to death for shooting a single victim for pecuniary gain. Not many of these defendants stayed on death row. Thirty-two (82.1%) of these defendants had their death sentences reduced to life or life without parole. In sum, *only* seven (1.75%) out of 399 defendants convicted of first-degree murder for single-victim shootings for pecuniary gain similar to Miller's case remained on death row after appeals, habeas corpus proceedings, commutation, and other sentence modifications.

---

[8] This Court adopted Rule 12 to assist in proportionality review of sentences. Under this rule, trial judges submit reports in cases that result in a conviction for first-degree murder.

4

All seven of these death penalty cases involved more premeditation, depravity and cruelty, and/or a defendant with a more lengthy and violent criminal history than Miller:

- *State v. Powers*, 101 S.W.3d 383 (Tenn. 2003)

The defendant was convicted of aggravated robbery and first-degree murder in the perpetration of robbery and was sentenced to death. The defendant followed the victim home after seeing her gambling at a casino. 101 S.W.3d at 388. The defendant kidnapped the victim in the driveway of her home and drove her to an abandoned house. *Id.* The defendant beat her, damaging her teeth and fracturing her jaw and other facial bones. *Id.* at 389. He shot her in the head and stole her jewelry and her casino winnings. *Id.* Over two weeks later, the victim's badly decomposed body was found at the abandoned house. *Id.* The defendant had previous convictions for aggravated assault, robbery, and assault with a dangerous weapon. *Id.* at 404.

- *Terry v. State*, 46 S.W.3d 147 (Tenn. 2001)

The defendant was convicted of premeditated first-degree murder and arson and was sentenced to death. 46 S.W.3d at 150. The defendant, who was a church official, stole money over time from a church where he worked. *Id.* at 151. He made an elaborate plan to stage his death and assume a new identity. *Id.* The defendant obtained a social security card, a driver's license, and other identifying documents in a deceased person's name. *Id.* The defendant befriended the victim and planned for him to play a role in the hoax. *Id.* When the defendant implemented his plan, he first shot and killed the victim in the church and severed his head and right forearm. *Id.* at 152. The defendant left the victim's body in the attic of the church, taking the victim's head and forearm with him in a bag. *Id.* He disposed of the victim's clothing and the hacksaw and knife used to dismember the body in a dumpster. *Id.* The defendant left the bag of the victim's body parts in a mini-warehouse and returned to the church to drop off cans of gasoline. *Id.*

From the church, the defendant went to the victim's boarding house where he left his wallet so it appeared the defendant had been there. *Id.* Near the victim's house, the defendant also left his vehicle which contained a beer bottle, some of the defendant's credit cards, a towel smeared with the defendant's blood, and the victim's fishing gear. *Id.* The defendant placed the victim's fingerprints on the beer bottle and the credit cards by using the victim's severed hand. *Id.* The defendant then took a taxi back to the warehouse, retrieved the bag containing the severed head and forearm, and drove his motorcycle from the warehouse to a lake where he rented a boat and dumped the bag. *Id.* The defendant returned to the church, where he removed some tattooed skin from what remained of the victim's arms, and flushed those pieces of skin down the toilet. *Id.* He then wrapped the victim's body in a carpet, leaving it along with chopped wood in the church's attic, and set the church on fire by dousing it with gasoline. *Id.* The defendant left town. A day later, he threw his pistol in the Mississippi River and called his lawyer. *Id.* at 152–53. When apprehended, the defendant showed no emotion or remorse. *Id.* at 153. This Court upheld the defendant's death sentence based on "extreme premeditation, an unarmed victim,

mutilation of the victim's body, and concealment of the crime to avoid detection and arrest." *Id.* at 166.

- *State v. Stephenson*, 195 S.W.3d 574 (Tenn. 2006), *abrogated on other grounds by State v. Watkins*, 362 S.W.3d 530 (Tenn. 2012)

The defendant was sentenced to death after being convicted of first-degree murder and conspiracy to commit first-degree murder for his part in the contract killing of his wife. 195 S.W.3d at 582. The defendant, who was having an affair with another woman, was the beneficiary of a $5,000 life insurance policy on his wife. *Id.* at 582–83. He tried unsuccessfully to hire a co-worker and then another man to kill his wife. *Id.* at 582. Later, the defendant and a hired accomplice lured his wife to an isolated area where she was shot in the forehead at close range while sitting in her car. *Id.* at 583. After the killing, the defendant left the state. When he returned for questioning, the defendant denied any involvement in the crime. *Id.* When implicated by his accomplice, the defendant admitted to the contract killing of his wife. *Id.* The defendant's two sons, who were four years old and eight months old when the murder occurred, were left motherless by the actions of their father. *Id.* at 582.

- *State v. Williams*, 657 S.W.2d 405 (Tenn. 1983)

A jury convicted the defendant of first-degree murder and first-degree burglary, and he was sentenced to death. 657 S.W.2d at 407. A priest, who did not appear at a morning mass, was found shot to death inside the rectory of a Catholic church. *Id.* at 407 n.1, 408. He had been shot twice; scrapes and lacerations on his body suggested he had struggled with his assailant. *Id.* at 408. The pockets of the priest's clothing were pulled out, coins were scattered on the floor, and there were signs of struggle in the rectory. *Id.* A witness identified the defendant as being at the scene shortly after the murder, the defendant admitted being on the premises, a strand of the priest's hair was found on the defendant's clothing, and the defendant sold the murder weapon the day after the murder. *Id.* at 411. The defendant had previously been convicted of second-degree murder of a young woman and first-degree murder of a police officer. *Id.* at 413.

- *State v. Workman*, 667 S.W.2d 44 (Tenn. 1984)

The defendant was convicted of first-degree murder during the commission of a robbery and was sentenced to death. 667 S.W.2d at 46. The defendant entered a Wendy's restaurant just before closing time. *Id.* After the restaurant closed, he herded the employees and a customer at gunpoint into the manager's office. *Id.* The defendant stole the day's receipts, took an employee's car keys, ordered everyone to stay in the office, locked the door, and left. *Id.* An employee had tripped a silent alarm, and three police officers responded to the scene. *Id.* The defendant resisted arrest. He shot and killed one police officer and fired shots at the other two officers, hitting one in the arm. *Id.* at 46–47. The defendant had previous convictions, including aggravated assault and burglary. *Id.* at 51.

- *State v. Chalmers*, 28 S.W.3d 913 (Tenn. 2000)

The defendant was sentenced to death for a felony murder committed during an especially aggravated robbery. 28 S.W.3d at 914. He and two accomplices drove around looking for someone to rob. *Id.* at 916. They pulled up in front of the victim and his cousin and demanded that they remove their clothes. *Id.* The defendant and his accomplices then stole three dollars. *Id.* The defendant fired his rifle at the victim, shooting him five times and killing him. *Id.* at 915. The defendant had previously been convicted of attempted especially aggravated robbery and attempted first-degree murder, which he committed on the same day when he fired fifteen rounds at a different victim while driving away. *Id.* at 916.

- *State v. Sims*, 45 S.W.3d 1 (Tenn. 2001)

The defendant was convicted of premeditated first-degree murder and especially aggravated burglary and was sentenced to death. 45 S.W.3d at 5. The victim returned home from work to find a vehicle in his carport and the defendant and an accomplice burglarizing his home. *Id.* The victim pulled his vehicle into the driveway, blocking the defendant's vehicle. *Id.* at 5–6. After the victim entered his home, the accomplice heard the defendant demanding the victim's keys and then heard eight or nine gunshots. *Id.* at 6. The defendant came out of the house holding the victim's gun and keys. *Id.* The defendant told the accomplice they had fought over the gun and that he had to kill the victim because he had seen his face. *Id.* The victim had a gunshot wound to his head and "had been struck at least ten times but probably many more" on his head, neck, shoulders, arms, sides, back, and buttocks. *Id.* at 7. He had been struck with a long, narrow, rod-shaped object at least a quarter inch wide and suffered at least six blows to his head, one of which fractured his skull. *Id.* The victim remained conscious and in severe pain until police and paramedics arrived. *Id.* at 6. The victim died at the hospital over four hours later. *Id.* The defendant had previous felony convictions including theft, aggravated assault, and aggravated burglary. *Id.* at 7.

We turn now to the four "similar" capital cases relied on by the Court in affirming Miller's death sentence. In all of these cases, the nature of the crimes and the defendants' characteristics are worse than in Miller's case.

In the first case, *State v. McKay*, 680 S.W.2d 447 (Tenn. 1984), the defendants' criminal conduct involved more victims and more cruelty than in Miller's case. The defendants, Larry McKay and Michael Eugene Sample, entered a store planning to rob it. *Id.* at 448–49. A customer in the store saw McKay holding a gun to the head of a store clerk. *Id.* at 449. The customer tried to run out the door, but Sample shot him in the thigh. *Id.* The customer pretended to be dead, but Sample discovered he was alive and shot him again, this time in the back. *Id.* McKay and Sample then started shooting and killed the two store clerks. *Id.* Then Sample came over to where the customer was lying on the floor and put a pistol to his head. *Id.* The pistol clicked several times but did not fire. *Id.* The customer

and Sample wrestled, and the gun fired past the customer's head. *Id.* The customer, who later identified the defendants, survived two shots and a missed shot. *Id.* In imposing the death sentence, the jury found the presence of four aggravating circumstances as to McKay, three aggravating circumstances as to Sample, and no mitigating circumstances as to either defendant. *Id.* at 448. This case is not similar to Miller's case as it involved three victims, one of whom was wounded twice and two others who died. Although Miller, like McKay, had a previous conviction of robbery committed with a deadly weapon,[9] the nature of McKay's crime and his characteristics are worse than Miller's.

In the second case, *State v. Howell*, 868 S.W.2d 238 (Tenn. 1993), the defendant shot a store clerk at close range in the forehead, killing him. *Id.* at 245. He and a friend fled the scene in a truck that the defendant had stolen the night before. *Id.* at 244–45. Later that same day while on the run in Oklahoma, the defendant shot and killed a woman in the parking lot of her apartment complex and stole her car. *Id.* at 245. A jury found the defendant guilty of felony murder and grand larceny and sentenced him to death for killing the store clerk in Tennessee. *Id.* at 247. The defendant had previously been convicted of armed robbery in Wyoming, armed robbery and attempted first-degree murder in Florida, and first-degree murder in Oklahoma. *Id.* at 246, 259. Unlike Miller, the defendant committed two murders on the same day and had felony convictions in three other states.

The third case the Court cites—*State v. Chalmers*, 28 S.W.3d 913—has already been addressed. In *Chalmers*, the defendant drove around with his accomplices looking for someone to rob, forced the victim and his cousin to disrobe, stole three dollars, and shot the victim five times, killing him. *See supra*; *Chalmers*, 28 S.W.3d at 916. The defendant had previously been convicted of attempted especially aggravated robbery and attempted first-degree murder for firing fifteen rounds at another victim that same night as the victim drove away. *Chalmers*, 28 S.W.3d at 916. There was no evidence that the defendant suffered the kind of troubled background or mental illness as Miller. *See id.* at 916–17. Miller's crime was less wanton and chaotic, and unlike the defendant here, Miller's criminal history did not include attempted first-degree murder.

In the final case, *State v. Reid*, 91 S.W.3d 247 (Tenn. 2002), the defendant shot two Captain D's restaurant employees—a sixteen-year-old and a twenty-five-year-old father of three—execution style while robbing them as they were preparing to open the restaurant on a Sunday morning. *Id.* at 261. The defendant had picked up a job application the night before and asked whether anyone would be at the restaurant on Sunday morning. *Id.* at 262. He was told that the manager would be there. *Id.* He apparently used the job application as a ruse to gain access to the restaurant that morning. *See id.* at 263. The jury convicted the defendant of two counts of first-degree murder and one count of especially aggravated robbery. *Id.* at 260. In the penalty phase, after hearing mitigating evidence about the defendant's difficult childhood and his mental health issues, *id.* at 267–71, the jury found

---

[9] The details of McKay's prior violent felony convictions are in the Rule 12 report. *Cf. State v. Kiser*, 284 S.W.3d 227, 274 n.37 (Tenn. 2009) (citing a Rule 12 report for the same purpose).

that the aggravating circumstances warranted a sentence of death. *Id.* at 271. On appeal, this Court found that the evidence painted a picture of a killer in complete control, firing multiple rounds into the bodies of "two unresisting employees as they were lying face down on the floor"—so many rounds that he had to manually reload his weapon before he stopped shooting. *Id.* at 287. The premeditated and methodical way in which these killings were carried out makes them worse than Miller's. This defendant would prove to be the "worst of the bad" and would go on to be dubbed the "fast-food killer."[10]

The four cases cited by the Court to support Miller's execution are dissimilar. There are at least four capital cases with circumstances similar to Miller's case in which the jury rejected the death penalty and voted to impose a sentence of life without parole or life. *See State v. Taylor*, No. M2005-00272-CCA-R3-CD, 2006 WL 2563433 (Tenn. Crim. App. Aug. 25, 2006), *perm. app. denied* (Tenn. Dec. 27, 2006) (upholding three concurrent sentences of life without parole instead of death for the first-degree murders of three unarmed employees of a Captain D's restaurant—two shot execution style while kneeling on the floor of the walk-in freezer and one sitting in his car in the parking lot—in the course of a premeditated robbery); *State v. Nur*, No. W2004-01259-CCA-R3-CD, 2005 WL 1467904 (Tenn. Crim. App. June 21, 2005), *perm. app. denied* (Tenn. Oct. 24, 2005) (upholding a life-without-parole sentence in which the State sought the death penalty for a defendant with a prior second-degree murder conviction who kicked down the door of an apartment to steal marijuana and shot and killed the victim as the defendant was fleeing); *Welch v. State*, 836 S.W.2d 586 (Tenn. Crim. App. 1992) (reviewing the denial of post-conviction relief in a case in which a jury rejected the death penalty in favor of a life sentence for a defendant with a previous first-degree murder conviction who shot and killed an elderly victim during an attempted robbery);[11] *State v. Walden*, No. 03C01-9707-CR-00317, 1998 WL 389062 (Tenn. Crim. App. July 14, 1998), *perm. app. denied* (Tenn. Jan. 25, 1999) (reviewing the denial of a motion for new trial in a case in which the jury imposed

---

[10] The defendant, Paul Dennis Reid, was dubbed the "fast-food killer" after killing seven people at three fast food restaurants within three months. In each case, he was convicted of first-degree murder and especially aggravated robbery and sentenced to death. He first committed the murders at Captain D's. A month later, the defendant entered a McDonald's restaurant and ordered four employees to lie on the floor in a storage room. *State v. Reid*, 213 S.W.3d 792, 805 (Tenn. 2006). He shot three employees, twice each. *Id.* When his gun malfunctioned, he fought with the remaining employee, stabbing him repeatedly until he feigned death. *Id.* After the defendant had robbed and left the restaurant, the employee called the police. *Id.* The jury sentenced the defendant to death in that case also. *Id.* at 808. In the third case, which occurred a month after the crimes at McDonald's, the defendant entered a Baskin-Robbins store near closing time. *See State v. Reid*, 164 S.W.3d 286, 297–300 (Tenn. 2005). He kidnapped two employees, repeatedly and brutally stabbed them, and disposed of their bodies at a nearby state park. *Id.* at 297–98. The two victims bled to death over a period of five to fifteen minutes. *Id.* at 300. According to expert testimony, they would have remained conscious and aware for 80% of that time. *Id.* The jury sentenced the defendant to death in that case as well. *Id.* at 303.

[11] The particular details of the defendants' prior violent felony convictions in *Nur* and *Welch* can be found in their Rule 12 reports.

9

a life sentence where the defendant robbed the victim, stomped on his head until he was dead, and then rolled the victim's car, with his body inside, into a body of water to conceal the crime).[12]

In addition, going beyond the narrow pool of cases required by *Bland*, there are first-degree murder cases similar to or worse than Miller's case that resulted in a life sentence in which the State did not seek the death penalty. *See, e.g.*, *State v. Honea*, No. M2009-01500-CCA-R3-CD, 2011 WL 332553 (Tenn. Crim. App. Jan. 28, 2011), *perm. app. denied* (Tenn. May 31, 2011) (remanding for merger of first-degree murder convictions in a case in which a defendant with a previous felony conviction was sentenced to life without parole plus 153 years for breaking into a ninety-two-year-old woman's home, kidnapping her, stealing her car, driving her to a remote location, fatally shooting her, then leaving her body covered with branches and saplings where it decomposed and was damaged by animals and insects); *State v. Carter*, No. E2005-01282-CCA-R3-CD, 2007 WL 1515010 (Tenn. Crim. App. May 24, 2007), *perm. app. denied* (Tenn. Aug. 13, 2007) (remanding for merger of first-degree murder convictions for a defendant whose prior convictions included aggravated assault, aggravated burglary, and assault with intent to murder, sentenced to life without parole for beating his friend to death with a torque wrench, striking his head twenty-two times to the point where the victim's face "caved in"); *State v. Campbell*, No. M2003-00597-CCA-R3-CD, 2004 WL 508477 (Tenn. Crim. App. Mar. 15, 2004) *perm. app. denied* (Tenn. Oct. 4, 2004) (upholding life sentence for a defendant with multiple prior assault and aggravated assault convictions who, along with an accomplice, robbed an elderly man, strangled him, bound his hands and ankles with a telephone cord and duct tape, and killed him by stuffing his mouth with paper towels, taping his mouth with duct tape, placing a plastic grocery bag over his head, and sealing the bag around his neck with duct tape); *State v. Brown*, No. W2004-01139-CCA-R3-CD, 2005 WL 885132 (Tenn. Crim. App. Apr. 18, 2005), *perm. app. denied* (Tenn. Oct. 24, 2005) (affirming life without parole for a defendant with prior convictions for aggravated assault and aggravated burglary[13] who savagely beat and stabbed an elderly victim while robbing him).

In sum, Miller's death sentence is disproportionate and excessive when compared with similar defendants in similar capital cases or in similar first-degree murder cases.

---

[12] There is no Rule 12 report for *Walden*.

[13] The particular details of the defendant's prior violent felony convictions can be found in his Rule 12 Report.

**III**.

The death penalty is the most severe and irreversible punishment that the State can impose on a defendant. There is no room for error. The death penalty should be imposed only in the rarest of cases—those cases that are the "worst of the bad." As this Court said twenty years ago, "[a]ll first degree murders are horrible"—but not many of these cases warrant the death penalty. *Godsey*, 60 S.W.3d at 792. It is our statutory duty to review each death sentence to guard against imposing aberrant sentences on individuals. Less than two out of 100 defendants like Miller who committed similar crimes have been sentenced to death. Miller's conduct in shooting and killing the market clerk for pecuniary gain is reprehensible, but it is not the "worst of the bad." Thus, Miller's death sentence is excessive and disproportionate considering the "nature of the crime and the defendant" as compared with similar first-degree murder cases, including capital cases. Tenn. Code Ann. § 39-13-206(c)(1)(D). Miller, who is currently the youngest person on death row in Tennessee,[14] should not be executed but should spend the rest of his life in prison.

Respectfully, I dissent from the decision to execute Urshawn Eric Miller. Putting him to death would not only be unjust, it would also violate his rights under the Eighth Amendment of the United States Constitution.

_____
SHARON G. LEE, JUSTICE

---

[14] *See* Tenn. Dep't of Corr., Death Row Offenders, https://tn.gov/correction/statistics-and-information/death-row-facts/death-row-offenders.html (last visited Nov. 29, 2021).