IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 28, 2005 Session

## STATE OF TENNESSEE v. DONALD LUKE SEIBER, ALIAS

**Direct Appeal from the Criminal Court for Knox County**
**No. 73049      Ray L. Jenkins, Judge**

---

**No. E2004-01794-CCA-R3-CD - Filed October 25, 2005**

---

The appellant, Donald Luke Seiber, was convicted of aggravated kidnapping, aggravated assault, and two counts of sexual battery, and he received a total effective sentence of sixteen years.  On appeal, the appellant challenges the sufficiency of the evidence, the trial court's evidentiary rulings, the trial court's jury instructions, and sentencing.  Upon our review of the record and the parties' briefs, we affirm the appellant's convictions but remand for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed and Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined.  JAMES CURWOOD WITT, JR., J., filed a separate concurring opinion.

Michael T. Cabage (on appeal and at trial) and Tom Slaughter (at trial), Knoxville, Tennessee, for the appellant, Donald Luke Seiber, alias.

Paul G. Summers, Attorney General and Reporter; David E. Coenen, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Philip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

At trial, the victim, Greta Goswick Miller, testified that at the beginning of 2001, she was homeless and addicted to crack cocaine.  In June 2001, the appellant allowed the victim to live with him in his house on Tillery Road in Knox County.  The victim said that the appellant treated her well, and she trusted him.

At approximately lunch time on Saturday, June 2, 2001, the victim informed the appellant that she was going to call a taxi so she could visit a sick friend.  The appellant told the victim that

she could not leave and that he would kill any taxi driver who came to take her away. The victim was surprised by the appellant's proclamation. The appellant then produced a gun and locked all of the doors. He proceeded to hit the victim with his fists and the gun, threw her on the floor, kicked her, dragged her by her hair, and stomped on her back. The victim stated that the ordeal lasted all day and into the night.

The victim said that the appellant was drinking rum during the incident. At one point during the episode, the appellant put the gun to the victim's head and forced her to drink half of a big bottle of rum in a short amount of time. The victim asserted that she did not "regularly" drink alcoholic beverages.

The victim recalled that Lou, a man who had sold her drugs, came to the appellant's house a few hours into the ordeal. She stated that Lou witnessed part of the abuse. Lou asked the appellant to stop abusing the victim; however, the appellant refused. Lou became scared and left the house.

The victim testified that although she could not remember falling asleep, she woke sometime late the next morning, Sunday, June 3, 2001. She was in one of the bedrooms but could not remember how she got there. When the victim came out of the bedroom, she noticed that the appellant's youngest son, Roger A. Seiber, was in the house. Seiber saw the victim and realized the appellant had hurt her. He began asking the appellant why he had hurt the victim. The victim testified that after Seiber's questioning, the appellant seemed to become more volatile. The appellant, still in possession of the gun, threatened to kill his son if he did not leave. Before Seiber left, the appellant pushed the victim up against a wall, placed the gun on top of her head, and fired a bullet into the wall right behind her head. The victim stated that the gunshot was loud and caused one of her eardrums to rupture, resulting in temporary hearing loss. Seiber begged the appellant to stop. The appellant told Seiber that if he left and called the police, he would kill the victim and any officer who came to help her.

The victim testified that Seiber then asked the appellant to go into another room with him, and the appellant complied. The victim asserted that she did not know what transpired between the men while they were in the other room. Seiber left after the conversation. The victim explained that she did not leave when Seiber did because the appellant still had the gun in his possession. Shortly after Seiber left, the appellant came into the kitchen and began to lightly slash the victim's face and neck with a steak knife. The appellant then ordered the victim to go into the bathroom, undress, and shave her pubic area. The appellant made the victim shave twice because her first attempt did not satisfy him. After the victim completed her task, the appellant instructed the victim to sit on the commode while he cut her hair very short with a pair of kitchen scissors. The victim stated that the cutting of her hair was extremely traumatic.

Next, the appellant ordered the victim, who was still sitting on the commode, to place one leg on the sink and the other leg on the edge of the bathtub. The appellant put the steak knife in the victim's mouth with the tip pointed toward the back of her throat and made her hold it, warning her that if she dropped the knife he would shove it through her neck. The appellant, who was wearing

heavy work boots, savagely kicked the victim repeatedly between her legs. The victim testified that it was difficult for her to hold onto the knife during the kicking because the abuse was painful.

After the appellant stopped kicking the victim, he took the knife from her mouth and inserted the full length of the blade into her genital opening, twisting the knife back and forth. The insertion of the knife caused the victim additional pain and some bleeding. The appellant alternated between inserting the knife inside her and kicking her while telling her that he was going to kill her and her family. The victim stated that after a certain point, she ceased being able to feel the pain the appellant was inflicting.

Finally, the appellant stopped assaulting the victim. He took her to the living room where he made her sit naked on some broken glass on the floor while she held the knife in her mouth lengthwise. The appellant sat in a chair across from the victim, but within a couple of minutes, he passed out. The victim kept the knife, put on a long-sleeved shirt, and ran out of the house. She stated that it was daylight outside, estimating that it was 5:00 p.m. She ran down Tillery Road and crossed over one street until she came to Officer Matthew Cook's house. The victim collapsed in Officer Cook's yard. She dropped the knife in the yard and told Officer Cook about her ordeal. Officer Cook called an ambulance for the victim.

The victim could not recall if hospital personnel were able to complete a pelvic examination on her, but she remembered that she was in tremendous pain and screamed every time they attempted to perform the examination. As a result of her injuries, the victim was hospitalized for five days and suffered tremendous pain. The victim said she underwent further medical treatment after being discharged from the hospital.

On cross-examination, the victim acknowledged that in April 2001 she was treated at Parkwest Hospital because she had abdominal pain, and she was having trouble with her memory and her balance. She was given pain medication for her ailments. The victim stated that she did not recall going to Prince Medical Center on Saturday, June 2, 2001. However, she explained that "a day before being beaten for two days straight, you know, some of my memory is foggy. I did take a lot of trauma to the head."

Also on cross-examination, the defense presented the victim with a handwritten letter bearing the date of June 2, 2001, the date of the incident. The victim agreed that she wrote the letter, but she denied that she had written it on that date. The victim acknowledged that within the week prior to the incident, the appellant had spent all of his money to bond the victim out of jail. Therefore, the victim contacted her father on two occasions, asking for money for food.

Officer Matthew Cook with the Knoxville Police Department testified that at the time of the offenses, he lived on Reeves Road which runs into Tillery Road. On the evening of June 3, 2001, when it was still light outside, Officer Cook was standing in his driveway talking with his parents. The victim, wearing only a button-down shirt, ran into his yard, carrying a knife and screaming for help. Officer Cook calmed the victim and encouraged her to put the knife down. The victim told

him she had been raped and held hostage. Officer Cook's mother retrieved a blanket from the house to cover the victim. The victim was subsequently transported to the hospital.

Penelope W. McDonald, a registered nurse, testified that on June 3, 2001, she performed a forensic sexual assault evaluation on the victim at the Fort Sanders Hospital. The victim told McDonald that the assault started at 4:30 p.m. on Saturday and continued until early Sunday morning when she was able to escape. The victim said that during her ordeal, she had been threatened with a gun, beaten, and kicked. The victim stated that she had been forced to hold a knife in her mouth while she was kicked in the genitals. Also, a knife was inserted into her vagina while her life was threatened.

During her examination of the victim, McDonald discovered that the victim had tenderness over the lower abdomen and multiple abrasions and bruising around her face and ears. McDonald said the victim had "reddish bruising on the chin and her right cheek was swollen from her ear to her lips." She also noticed that the victim's hair had been cut.

There was a diamond patterned injury on the victim's right shoulder and bruising on the insides of her thighs. McDonald observed that the victim's "external genitalia, the labia majora, were purple and discolored and swollen better than twice their normal size." Additionally, the victim

> had injuries internally on the labia minora with – that were small injuries, but were – would be consistent with penetration. They were too small – I think I described them as one millimeter lacerations on the labia minora. Two of them at one o-clock and three o'clock. And the small size of those lacerations would indicate that it was the result of something sharp and pointed such as a knife.

McDonald stated that the victim was in discomfort during the examination. McDonald noted that the examination of the victim's genital region was difficult because of the swelling to the area. McDonald recalled that there was no abrasion or active bleeding to the injured area. Additionally, McDonald said that although there were no boot marks to the victim's genitals, there was bruising to the victim's genitals and inner thighs.

McDonald testified that she was present during the physician's pelvic examination of the victim, which examination revealed that there were no lacerations inside the vagina but there were lacerations on the labia minora. She stated that the lacerations to the victim's labia minora were very small, pin point lacerations, or puncture type wounds, which could have been made by a pointed object. Based upon her examination of the victim, McDonald opined that the lacerations she saw on the victim indicated that the victim was penetrated with a knife to some degree. Moreover, McDonald noted that because of the frightening nature of the assault, "it would not at all be uncommon for her to perceive that the knife was all the way in."

-4-

On cross-examination, McDonald acknowledged that the victim had a history of depression. The victim told McDonald that she had a history of cocaine abuse but that she had not used any cocaine for some time.

Dr. Craig Aren Myers, an obstetrician and gynecologist, testified that in June 2001, he was called to the emergency room to evaluate the victim for genital trauma from sexual assault. Upon initial perusal, he noticed that the victim's hair had been cut and she had multiple bruises and scratches on her body. During the pelvic examination, Dr. Myers observed that the victim's vulvar area had scratches or nicks and a large, swollen bruise. He acknowledged that he did not find any lacerations inside the victim's vagina and that the lacerations on the labia minora could have been caused from blunt trauma, such as from a "straddle injury."

Roger A. Seiber, the appellant's twenty-eight-year-old son, testified that his father paged him around 2:30 p.m. on Sunday, June 3, 2001, and asked Seiber to come to the appellant's house because he was in some trouble. When Seiber arrived at the appellant's house between 3:30 p.m. and 4:00 p.m., he noticed that the appellant had been drinking quite a bit. The men stood in the kitchen, and Seiber asked the appellant if everything was okay. The appellant told Seiber that he and the victim were having some difficulties in their relationship. The appellant said that a man had come to his house the night before and threatened his life and that he and the victim had been arguing and fighting about the man most of the day.

Seiber then walked through the house and saw the victim, who looked like she had been up all night. Seiber stated that both the appellant and the victim looked "pretty rough." The victim told him that she and the appellant had been up all night fighting and that she was afraid to leave. As Seiber and the victim were talking in the kitchen, the appellant came into the room with his finger on the trigger of a pistol, and "he put his hand on [the victim] over here, up against the door like this." The gun discharged, and the bullet lodged in the door frame above the victim's head. Seiber testified that the appellant appeared to be shocked that the gun had discharged. Seiber said his father gave him the gun, and the situation calmed down.

After Seiber took possession of the gun, the appellant showed Seiber some scratches on his arms and neck, and they talked in the kitchen while the victim went outside. Seiber asserted that the appellant did not prevent the victim from leaving and that she was outside smoking a cigarette when he left. Seiber did not see any bruising or blood on the victim when he left, and he said that her hair had not been cut. Seiber said that he stayed at the appellant's house approximately forty-five minutes to an hour, and he denied that the appellant threatened to kill him. Seiber acknowledged that he did not tell the victim he was taking the appellant's gun with him when he left, but he said that as he was leaving he walked right by her with the pistol in his hand.

Approximately two hours after he left the appellant's house, Seiber was notified that police had surrounded the appellant's house. Seiber, accompanied by a friend who was a police officer, returned to the appellant's house. Upon arrival, Seiber and the officers entered the residence and

found the appellant passed out in a chair in the living room. The appellant woke, disoriented, and police handcuffed him.

Investigator Shane Cooper with the Knoxville Police Department testified that the 911 call regarding the victim came in at 6:57 p.m. on Sunday, June 3, 2001. After the call, he interviewed the appellant. Investigator Cooper asked the appellant about the abuse of the victim, and the appellant responded that nothing had happened. During the interview, the appellant initially denied having a gun. However, after Investigator Cooper confronted the appellant with Seiber's statement that the appellant had a gun, the appellant admitted that he had a gun, but he denied firing it. The appellant showed Cooper some scratches on his body, saying that the victim had inflicted them on Saturday. Investigator Cooper acknowledged that the knife used during the offenses was not tested until three years later. He explained, "I didn't feel a need to send the knife to be tested. I had a defendant that I could prove was lying, due to his own son's testimony. And he had denied having a gun. I could prove he had the gun. His own son said he shot the gun . . . . The knife had been out in the weather, and I didn't see an issue at that time of having it sent to be tested."

Gerald Smith, a senior evidence technician with the forensic unit of the Knoxville Police Department, testified that he was dispatched to the appellant's residence at 7:25 p.m. on June 3, 2001. Upon his arrival, he was sent to Officer Cook's house on Reeves Road. At that location, Smith observed a steak knife in the front yard, and he collected the knife as evidence. Inside the appellant's house, Smith found a pair of scissors and hair on the bathroom floor. Smith also collected blood samples from the bathtub, sink, and toilet; a .22 caliber round on the hall floor; a magazine containing five .22 caliber rounds on a closet shelf in the hallway; and a bullet from the door leading from the kitchen down to the basement. Smith later received from Officer Ashburn a Ruger .22 caliber automatic weapon and a magazine containing six rounds.

Kevin Woodby, a forensic scientist with the Tennessee Bureau of Investigation ("TBI") DNA Serology Section testified that about two weeks before trial, he examined the knife recovered from Officer Cook's yard. Woodby did not find any blood on the knife; however, he explained that he "found some dirt that was on the knife that would affect finding any blood that could have been on there." Woodby stated that environmental conditions can affect the ability to detect blood on evidence, especially on a knife with a metal surface. Also, he opined that the passage of time could affect his ability to find blood on a piece of evidence.

Dr. David Moore, a physician with the Prince Medical Center, testified that the victim was treated at the clinic on Saturday, June 2, 2001, at approximately 6:30 p.m. According to the victim's medical records, the victim "complained of bruises on her left leg, headache, difficulty walking, pain, and weakness." She was prescribed an antibiotic.

At the conclusion of the trial, the jury convicted the appellant of two counts of sexual battery, one count of aggravated kidnapping, and one count of aggravated assault. The trial court sentenced the appellant as a violent offender to eleven years for the aggravated kidnapping conviction and, as a Range I standard offender, to five years for the aggravated assault conviction and two years for

each of the sexual battery convictions. The court ordered the appellant to serve the sentences for the sexual battery convictions concurrently with the sentence for the aggravated kidnapping conviction. The court also ordered the appellant to serve the sentence for his aggravated assault conviction consecutively to his sentence for the aggravated kidnapping conviction, for an effective sentence of sixteen years. On appeal, the appellant argues that the evidence was insufficient to sustain his convictions, that the trial court erred in its evidentiary rulings, the trial court erred in its jury instructions, and the trial court erred in sentencing.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant argues that the evidence is insufficient to sustain his convictions, contending that the State failed to prove beyond a reasonable doubt that he was the person who unlawfully assaulted the victim. Specifically, the appellant argues that the victim's drug dealer, Lou, was responsible for the injuries she sustained on June 2, 2001.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Tennessee Code Annotated section 39-13-304(a)(5) (1997) defines aggravated kidnapping as "false imprisonment, as defined in § 39-13-302, committed . . . [w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." False imprisonment is defined as the knowing removal or confinement of another unlawfully so as to interfere substantially with the other's liberty. Tenn. Code Ann. § 39-13-302(a) (1997). The victim testified that the appellant, not her drug dealer, held her at gunpoint and knifepoint in his home for a period of several hours. She stated that she believed the appellant would use the weapons on her if she attempted to leave. She further stated that the doors were locked, and she never felt that she could escape from the appellant. The victim testified that the appellant held the knife against her neck and cut her with it and that she was very frightened for her life. Seiber, the appellant's son, testified that the appellant came into the kitchen where he and the victim were talking. The appellant was carrying the gun in one hand with his finger on the trigger. The appellant put his other hand on the victim "up against

the door." The gun then discharged, and the bullet lodged in the door frame over the victim's head. Accordingly, we conclude that the evidence is sufficient to support the appellant's conviction for aggravated kidnapping.

In order to obtain the appellant's conviction for aggravated assault, the State needed to prove that the appellant intentionally or knowingly assaulted the victim while using or displaying a deadly weapon. See Tenn. Code Ann. § 39-13-102(a)(1)(B) (1997). An assault is committed when the appellant "[i]ntentionally or knowingly cause[s] another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2) (2003). The victim testified that the appellant hit her with his fists and the gun, threw her on the floor, kicked her, dragged her by her hair, stomped on her back, slashed her face and neck with a steak knife, put the knife in her mouth with the tip pointed toward the back of her throat, and, while wearing work boots, repeatedly kicked her genital region. Nurse McDonald testified that the victim's injuries included multiple abrasions and bruising around her face and ears, a diamond patterned injury on her right shoulder, bruising on the insides of her thighs, lacerations to the labia minora, and swelling and discoloration to the labia majora. Dr. Myers testified that the victim had multiple bruises and scratches, as well as a large vulvar hematoma. As a result of her injuries, the victim was hospitalized for five days. We conclude that the evidence overwhelmingly supports the appellant's conviction for aggravated assault.

The appellant was also convicted of two counts of sexual battery. Tennessee Code Annotated section 39-13-505(a)(1)-(2) (1997) defines sexual battery as follows:

> (a) Sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:
>
> (1) Force or coercion is used to accomplish the act; [or]
>
> (2) The sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent . . . .

In the instant case, the victim testified that the appellant inserted a steak knife into her genital opening and twisted it. He then alternated between inserting the knife inside her and kicking her genitals while telling her that he was going to kill her and her family. While the appellant asserts that the proof at trial indicated that the victim's drug dealer was responsible for her injuries, the jury, as was its prerogative, heard the proof and determined that the appellant was guilty of two counts of sexual battery. We conclude that the evidence amply supports the jury's determination.

## B. Evidentiary Rulings

Next, the appellant argues that the trial court erred in "not allowing the [appellant] to introduce into evidence the handwritten letter authenticated by [the victim] to be a letter she

authored, as well as not allowing the [appellant] to cross-examine [the victim] regarding this letter or regarding her previous medical treatment and the receipt of funds from Federal Express." The appellant argues that the letter written by the victim demonstrates that she had motive to lie about the appellant and that she lied during her trial testimony. The appellant contends that he should have been allowed to introduce evidence regarding her June 1, 2001, medical treatment to demonstrate that at least some of her injuries were attributable to earlier, accidental events.

First, we will address the appellant's complaints regarding the trial court's failure to admit a letter purportedly written by the victim on June 2, 2001, the day the assault began. The letter which the appellant sought to introduce into evidence consists of eight handwritten pages. During cross-examination of the victim, the appellant was asked, "When did you write this eight page letter to your father dated June 2nd, which is Saturday, which says that, 'This evening I went to Prince Medical Center.'" The State objected to the question because the victim had not been shown the letter prior to being questioned about it. The trial court sustained the objection. The appellant then handed the victim the letter. After perusing the document, the victim identified the handwriting in the letter as her handwriting. She acknowledged that the letter was dated June 2, 2001; however, she denied that she had written the letter on that day.

The appellant then asked the victim to read the second paragraph of the letter but asked for the entire letter to be admitted into evidence. The State again objected, noting that it had not been provided a copy of the letter and also asserting that "[the victim] has testified that this is not anything written at or about the times of this incident." The State also argued, "If it talks about anything other then this incident or what happened on this day, it's irrelevant." The trial court sustained the objection but allowed the appellant to file the letter as a "proffer."

Next, the appellant attempted to ask the victim about the contents of the third paragraph of the letter in which she mentions bruises on her legs. The State again objected to the appellant questioning the victim regarding the contents of the letter. The trial court sustained the State's objection. At several subsequent points in the trial, after the victim had completed her testimony, the appellant continued to request that the letter be made an exhibit.

Initially, we note that although the appellant sought to question the victim only about the second and third paragraphs of the letter, he sought to have the letter in its entirety entered into evidence. On appeal, the appellant contends that the letter shows that the victim had a motive for lying about the appellant abusing her. He argues that in the letter, the victim told her father that she did not love the appellant and wanted to come home.[1] Additionally, the appellant claims that if the

_____

[1] The letter provides:

> I don't love Lee [the appellant] & we actually don't get along very well. He says a lot of hurtful things to me & drinks too much, which is when he picks on me. However, it is better than being on the street because there is no way I could stay clean [from drugs] on the street! Also, I need to have a place where I can shower

(continued...)

letter was written on June 2, 2001, it would show that the victim was lying about being constantly abused on that date.

The appellant has failed to give any citations to the record regarding his argument for the admission of the letter, arguably waiving this issue on appeal. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) ("The brief of the appellant shall contain . . . [a]n argument, which may be preceded by a summary of argument, setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on."). Regardless, we will briefly address this issue.

On appeal, the appellant makes numerous arguments as to why the trial court erred in refusing to allow the victim's letter to introduced as an exhibit and read to the jury. Among the claims are that, in the letter, the victim "clearly gives a motive for lying" about the incident with the appellant; that she "does not love [him], and she is only using him;" that "[s]he will do anything to come home;" and that the length of the letter "contradicts the sworn testimony that the victim was beaten all night on June 2, 2001." However, most of the appellant's arguments were not raised in the trial court and are instead presented for the first time on appeal. A party is bound by the evidentiary theory argued to the trial court and may not change or add theories on appeal. See State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993). Thus, this court may consider only the arguments presented to the trial court as to why the letter should have been admitted into evidence.

As we stated earlier, the appellant initiated discussion about the letter by questioning the victim as to when she wrote the letter. The State objected. The appellant explained his argument as to why the letter should be admitted into evidence and read to the jury as follows:

> The witness has identified it [a]s a letter she's written. Even though it's dated June 2nd, she has testified she's not sure when she wrote it. We would like to enter it as an exhibit and the jury can determine . . . .

Thus, it appears that the appellant argued that the entire letter should be admitted because the victim authenticated her handwriting, regardless of the victim's assertion that she did not write the letter on June 2, 2001. The appellant made no attempt to explain the distinction between the portions of the letter which he argues, on appeal, were relevant to explain the victim's bruises and her

[1](...continued)
> and do my hair . . . for court & have a ride to [my court dates]. If it weren't for those things I wouldn't be here. I would rather be home but this will have to do, although I hope it won't be forever.

dishonesty and the remainder of the letter. In other words, the appellant made no argument to the trial court as to why the entire letter should be admitted into evidence.

The appellant made a second attempt to have the letter admitted. The appellant contended that in the first paragraph of the letter, the victim stated that she went to Prince Medical Center on the evening of June 2, 2001, which contradicted her trial testimony that she did not go to the clinic on that date. Additionally, the appellant pointed out that the victim wrote in the letter that the doctors at Prince Medical Center found unexplained bruises on her legs. Also, the appellant contended that the victim's statement that she would do anything to come home shows the victim's motive to lie about the appellant's abuse. In sum, the appellant argued that the letter was "clearly relevant, and it goes directly to her motive and to her credibility." The State again objected to the admission of the letter, arguing that the charges against the appellant stemmed from activities on June 3, 2001, making the relevancy of the letter "tenuous at best." The State again emphasized that the victim had denied that she wrote the letter on June 2, 2001. The trial court sustained the State's objection.

From our reading of the entirety of the letter, we fail to see that the letter establishes the victim's motive to lie. The appellant claims that the letter indicates that the victim did not love the appellant and would do anything to come home. Our reading of the letter reveals that the victim stated that although she did not love the appellant, staying with him was the best option she had available to her at that time. Moreover, when the victim discussed her desire to go home to her family, she was essentially pleading with family members to forgive her for hurting them while she was addicted to drugs.

Additionally, the appellant contended that the letter should be entered into evidence to demonstrate inconsistencies in the victim's testimony; however, the appellant failed to cite any evidentiary rule which would support the admission of the letter to demonstrate inconsistencies.

The proper way to question the witness as to the letter, and then seek its introduction into evidence, has been explained in Neil P. Cohen et al., Tennessee Law of Evidence, § 6.13[5][b] (4th ed. 2000):

> If extrinsic evidence of a prior inconsistent statement is to be admitted into evidence, Rule 613 states that the witness must be afforded an opportunity to explain or deny the statement unless the interests of justice otherwise require. Although Rule 613 does not detail how or when this is to occur, the omission rarely will pose a problem. Since, as noted above, the witness must be asked about the prior statement before extrinsic evidence is ordinarily admissible, the witness will be able to explain or deny the statement during cross-examination itself or later during redirect examination.

The opportunity to explain or deny the inconsistent statement includes the right to put it in context so the jury can assess the extent of inconsistency.

Although the appellant argued at various points in the trial that the letter should be admitted into evidence, he did so after the victim had completed her testimony. In the instant case, the victim was not afforded the opportunity to give any explanation as to the date of the letter or any of its contents. We conclude that the trial court did not abuse its discretion in refusing to allow the letter to come into evidence.

The appellant also argues on appeal that the trial court erred in refusing to allow the appellant to cross-examine the victim or enter into evidence medical records regarding her treatment at Parkwest Hospital on June 1, 2001. He further argues that the trial court erred by not allowing him to cross-examine the victim or enter into evidence records regarding the transfer of money from the victim's father to the appellant on June 2, 2001. The appellant's brief makes no references to the record on appeal as to the trial court's limiting cross-examination that he argues occurred. Accordingly, these arguments are waived. See Tenn. Ct. Crim. App. R. 10(b). Additionally, our review of these two claims is further precluded by the appellant's failure to raise either issue in his motion for new trial. Rule 3(e) of the Tennessee Rules of Appellate Procedure provides that

no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Accordingly, these arguments are waived as well. The appellant is not entitled to relief on this issue.

## C. Jury Instructions

As his third issue, the appellant contends that the trial court "erred in reading the aggravated kidnapping as a lesser-included offense out of order during the charge to the jury," saying that it "was prejudicial error which called undue attention to this charge and resulted in harm to his defense." However, we note that the appellant made no contemporaneous objection at trial as to this alleged error. Accordingly, the claim is waived. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

## D. Sentencing

As his final issue, the appellant argues that the trial court erred in enhancing his aggravated kidnapping and aggravated assault sentences and in ordering them to be served consecutively. Appellate review of the length, range, or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d) (2003). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentences. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The appellant was convicted of Class B, C, and E felonies. At the time of the appellant's sentencing, a trial court was required to begin a sentencing determination regarding a Class B, C, or E felony at the presumptive minimum, then "enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence as appropriate for the mitigating factors." Tenn. Code Ann. § 40-35-210(e). The presumptive sentence for Class B, C, and E felonies is the minimum sentence within the appropriate range. See Tenn. Code Ann. § 40-35-210(c). The appellant was sentenced as a Range I offender. Accordingly, the presumptive sentence was eight years for the Class B felony, three years for the Class C felony, and one year for the Class E felonies. See Tenn. Code Ann. § 40-35-112(a).[2]

In enhancing the appellant's sentences, the trial court applied the following enhancement factors: (2) the appellant has a previous history of criminal convictions or criminal behavior; (6) the appellant treated the victim with exceptional cruelty during the commission of the offense; (7) the personal injuries inflicted upon the victim were particularly great; (10) the appellant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense; (11) the appellant had no hesitation about committing a crime when the risk to human life was high; and (17) the crime was committed under circumstances under which the potential for bodily injury to the victim was great. See Tenn. Code Ann. § 40-35-114(2), (6), (7), (10), (11), and (17) (2003).

The appellant argues on appeal that none of these factors were applicable and that the court, instead, should have applied, as mitigating factors, that the appellant did not have a significant prior criminal history and that he would be in his seventies before being eligible for parole.

_____

[2] The appellant was designated a Range I standard offender regarding the aggravated kidnapping offense for the purpose of determining the length of his sentence. However, the judgment of conviction for the aggravated kidnapping conviction categorized the appellant as a violent offender, meaning that the appellant would have to serve one hundred percent of his sentence in confinement, less no more than fifteen percent for sentencing credits. See Tenn. Code Ann. § 40-35-501(i)(2)(D) (2003).

In ordering that the appellant's sentences for aggravated kidnapping and aggravated assault be served consecutively, the trial court, although acknowledging that the State had argued that he was "a dangerous offender whose behavior indicates little or not regard for human life," simply ordered that two of the appellant's sentences be served consecutively, without explaining the reason for doing so.

We note that "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) (2003) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). Specifically, that code section provides that consecutive sentencing is permitted when any one of the following criteria are met:

> (1) The [appellant] is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The [appellant] is an offender whose record of criminal activity is extensive;
>
> (3) The [appellant] is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the [appellant's] criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The [appellant] is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The [appellant] is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of [appellant's] undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
>
> (6) The [appellant] is sentenced for an offense committed while on probation; or
>
> (7) The [appellant] is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b)(1)-(7).

In <u>Wilkerson</u>, 905 S.W.2d at 938, our supreme court held that satisfying Tennessee Code Annotated section 40-35-115(b)(4), by itself, was not sufficient to sustain consecutive sentences. If a defendant is found to be a dangerous offender under the statute, the trial court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant, the <u>Wilkerson</u> factors. <u>Id.</u> Moreover, trial courts must make specific findings regarding these factors before imposing consecutive sentences. <u>State v. Lane</u>, 3 S.W.3d 456, 461 (Tenn. 1999). In the instant case, there is no evidence in the record that the trial court considered the <u>Wilkerson</u> factors before ordering consecutive sentencing. Accordingly, this matter is remanded for the trial court to make findings necessary for this court to determine whether consecutive sentencing was appropriate.

As to the sentences themselves, we conclude that the matter must be remanded for the trial court to identify, *inter alia*, the facts supporting each enhancement factor found to be applicable. As our supreme court has explained, "To facilitate appellate review, the trial court 'must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.'" <u>State v. Poole</u>, 945 S.W.2d 93, 96 (Tenn. 1997) (quoting <u>State v. Jones</u>, 883 S.W.2d 597, 601 (Tenn. 1994)); <u>see also</u> <u>State v. Ervin</u>, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996).

Accordingly, we remand this matter for the trial court to make findings, as set out in this opinion, as to the application of enhancement factors and the order of consecutive sentencing.

### III. Conclusion

Based upon the foregoing, we affirm the appellant's convictions but remand for a new sentencing hearing.

_____
NORMA McGEE OGLE, JUDGE